[Civ. No. 22868. Second Dist., Div. One. Aug. 28, 1958.]

MAXINE V. JUE et al., Respondents, v. SAN TONG JUE et al., Appellants.

RUSH M. BLODGET, as Executor, etc., Respondent, v. SAN TONG JUE, Appellant.

DOROTHY JUE MOE, Respondent, v. SAN TONG JUE, Appellant.

John N. Hurtt and Guy Richards Crump for Appellants.

Robert A. Waring and Andrew J. Copp, Jr., for Respondents.

WHITE, P. J.—Three actions were filed, consolidated for trial, and disposed of by one set of findings and conclusions and one judgment. Defendants, other than Corinne Jue Kwok who was not served with process and did not appear in the action, have appealed from the judgment.

The judgment incorporates 22 pages of findings of fact and conclusions of law as to the rights, interests, duties and obligations of the parties. In turn the findings and conclusions incorporate by reference the 12-page notice of decision filed December 28, 1956, and the 6-page supplemental notice of decision filed February 15, 1957.

Many issues in addition to those discussed in the briefs on appeal were litigated in the trial which continued from October 22 to December 18, 1956, was reopened after the service of the notice of decision dated December 28th, and resubmitted on February 8, 1957. Some of the issues not raised on appeal were decided in favor of defendants because of implied waivers, estoppel and the statute of limitations. For the sake of brevity, we hereinafter epitomize only the portions of the judgment under attack and the facts pertinent to the consideration of the issues raised on appeal.

The litigants are the widow, children and grandchildren of Jue Joe, and Attorney Rush M. Blodget, as executor of Jue Joe's will.

Jue Joe was born in China in 1870, came to Southern California about 1886, and remained here until 1902, when he returned to China and married Leong Shee, who was born in China in 1885. In China two sons were born to them: San You Jue, herein and generally called "Sam," born in 1903; and San Tong Jue, herein and generally called "San Tong," born in 1905.

In 1905 Jue Joe returned to Southern California. He spoke little English and wrote only a little Chinese. His American neighbors became his friends and those friendships continued until his death. He worked from daylight until dark, seven days a week, raised asparagus and other vegetables on large farms in several counties, marketed his produce in Los Angeles, and saved his money.

In 1918 Jue Joe sent for Leong Shee, Sam and San Tong, who then came from China and joined him in Southern California. Here two daughters were born: Corinne in 1919 and Dorothy in 1921.

Sam died in Los Angeles in 1933, leaving a widow, Maxine May Kam Jue, called "May," and three daughters, June C. born in 1925, Maxine V. born in 1927, and Leatrice born in 1928.

February 26, 1941, Jue Joe died in San Fernando Valley. He left a widow, Leong Shee, a son and two daughters, San Tong, Corinne and Dorothy, seven grandchildren, June, Max-

ine and Leatrice, daughters of his deceased son Sam, Jack and Joan, children of San Tong and his first wife Rose who died in 1935, Soo Jan and Guy, children of San Tong and his second wife Ping.

Between the time of Jue Joe's death in 1941 and the trial in 1956, Corinne, Dorothy, Jack and Joan were married, and eight more grandchildren and several great grandchildren were born.

Each member of the family, as above outlined, was also known by several other names, some Chinese and some American, some given in accordance with ancient Chinese customs, and some probably accidental as ''Sam'' for San You Jue, but throughout this decision we will refer to each as listed above.

Notwithstanding the California Alien Land Law and the federal Chinese Exclusion Act, Jue Joe with the assistance of his friends invested some of his savings in a number of parcels of California real property, paid for them in annual instalments, and had contracts made in the names of, and titles conveyed to, other persons. Only two parcels so purchased are subjects of the instant appeal. They are ''Lot 690,'' about 50 acres in San Fernando Valley (now in the Van Nuys District of the City of Los Angeles), and the ''Tulare property,'' about 90 acres near Porterville in Tulare County. Jue Joe farmed both properties from their purchase until his death. The facts and issues regarding title to these two parcels of real property differ materially and will be hereafter separately stated.

## Lot 690

Appellants assign as error the decision that Lot 690 was owned by Leong Shee, San Tong, Corinne, Dorothy and Maxine as administratrix of the estate of her deceased father Sam, as tenants in common, each owning an undivided one-fifth. Corinne, Dorothy and Maxine have not appealed.

Although apparently all defendants (except Corinne) are appellants, in their opening brief they state that their contention at the trial based upon oral evidence of declarations of Jue Joe that Corinne held title to Lot 690 in trust for the benefit of Jack, the firstborn grandson, and not for the family was decided against them upon conflicting evidence; and they ''admit that there is substantial evidence supporting the holding against Jack and in favor of a trust'' for ''the family'' of Jue Joe.

Appellants urge that, even if Jue Joe succeeded in creating a valid trust as to Lot 690, it could involve only

his half of the community property and have no effect upon the half belonging to Leong Shee. Leong Shee is the only defendant-appellant who could have been prejudiced by the failure of the court to award her one-half of Lot 690 as her community interest. By the judgment, the court undertook to enforce the trust "for the family" as to the whole of Lot 690, not against Corinne, the trustee who conscientiously tried to perform her duties and received no benefit from San Tong's usurpation, but against San Tong and Jack who have shown no right whatever for San Tong's taking of the proceeds of the sale of 35 acres and having title to the remaining 15 acres transferred to Jack.

Although Leong Shee was herself a party and a witness at the trial, she did not claim for herself any community or other interest in Lot 690. There is evidence in the record that she was present in 1942 when San Tong demanded that Corinne deed the property to Jack to prevent Corinne's husband from getting it away from "the family," when Corinne handed the deed to Dorothy requesting that she make sure Lot 690 was held for "the family," and when Dorothy promised that she would. We cannot say that, as a matter of law, the trial court erred in determining that Leong Shee knew of the creation of the trust by Jue Joe and acquiesced therein. Therefore, if the trust was valid as against Jue Joe, it is likewise valid as to the community interest of Leong Shee.

Appellants urge further that the trust is invalid because of the uncertainty of its terms. As to community property, Leong Shee was the only heir at law of Jue Joe, and she was the only beneficiary named in his will. Jue Joe had no debts. If the trust was too uncertain to be validly enforced as to the property of Jue Joe, likewise it was unenforceable as to the interest of Leong Shee, and the whole of Lot 690 belonged to Leong Shee upon Jue Joe's death.

It is therefore necessary to review the evidence tending to support the judgment that the trust "for the family" was valid. There are over 3,000 pages of reporter's transcript, 102 exhibits introduced by plaintiffs and 199 exhibits introduced by defendants. The evidence is conflicting in many respects.

With the help of his friend, O. F. Brant of the Title Insurance and Trust Company, Jue Joe bought Lot 690 from one Anderson in 1919, the year of Corinne's birth. Deed dated October 29, 1919, conveyed title in trust to Title Insurance and Trust Company, subject to Anderson's trust deed to Title Guarantee and Trust Company securing Anderson's indebted-

ness of $18,000. The declaration of trust dated November 1, 1919, recites that no part of the consideration was paid by Title Insurance and Trust Company and certifies that said property is held by it in trust for O. F. Brant, beneficiary. The specified purpose of the trust is to convey "upon written demand" to said "O. F. Brant or order." Assignment of beneficial interest to Corinne (referred to therein by her Chinese name "Ah How Jew"), signed by O. F. Brant and Sue E. Brant, is dated November 7, 1919. In the same file of the Title Company was a letter signed by Corinne as Ah How Jew, dated March 18, 1940, directing the Title Insurance and Trust Company to convey Lot 690 to her and, as a part of the same document, under date of March 19, 1940, appears Corinne's receipt for an unrecorded quitclaim deed of the property and her acknowledgment of the termination of the trust.

From the purchase of Lot 690 in 1919 until his death in 1941, Jue Joe and his family lived upon Lot 690 and considered it their family home. Jue Joe, his wife, children and grandchildren (with the exception of Sam's children after Sam's death) lived there. Jue Joe and his sons grew asparagus on the unoccupied portion of it and marketed the asparagus as a part of Jue Joe's business, sometimes referred to as "Jue Joe Company" and sometimes as "the family business." During a part of this time, the adjoining 50 acres of Lot 691, which had been bought by Jue Joe and conveyed to Corinne and Dorothy as absolute owners, was likewise used for farming and marketing as a part of the family business. Although a guardian of the estates of the two minor daughters had been appointed, no accounts were rendered. Apparently, during his entire life, Jue Joe took care of his family and no thought was given to rents, profits or wages which might be due from any member of the family to any other.

Up to the time of his death in 1941, Jue Joe also carried on large farming projects near Newhall and Saugus in Los Angeles County, and in Tulare County, and at various times he farmed other lands in Los Angeles and Riverside Counties. He taught his sons to grow and market asparagus and other vegetables, gave San Tong a high school education, cared for San Tong's two oldest children, Jack and Joan, after their mother's death, helped San Tong to return to China to marry his second wife, Ping, sent Corinne to the University of California at Los Angeles, and Dorothy to the University of Southern California.

Corinne had been told many times, from her earliest childhood up to her father's death in 1941, that she was "to hold title to Lot 690 ... for the benefit of the family," and she had always told her father that she would. She didn't hear "any technicalities" about it, but her father had told her that she owned the property and was to hold it for the family, to give it to them. After Corinne's 21st birthday in 1940, she received the deed from the title company. Before that she had thought that the title was in her name. Then, in 1940, her father again told her to keep Lot 690 for the family, and she promised him that she would.

After Jue Joe's death in February, 1941, the family's use and occupancy of Lot 690 continued as before, except that San Tong acted as head of the family, managed the farms, marketed the produce, handled the money, and "advanced" to Dorothy and the others the money they needed. Dorothy continued her studies at the university. Each member of the family "did something to help" in the business.

July 4, 1942, Corrine married Lansing Kwok. She telephoned from San Francisco to tell San Tong of her marriage, and he told her to come down to Los Angeles at once and attend to Lot 690. She came down by plane, and on July 11th signed a deed in favor of Jack. The deed is dated June 11, 1942, but Corinne testified that it was signed on July 11, 1942. After she signed it she wanted to keep it, but San Tong said that Lot 690 was "for the family" and the deed should be in more neutral hands so her husband wouldn't get it if anything should happen to her in a plane crash or an accident. She noticed and mentioned to San Tong that the deed described her as a single woman. He said perhaps it was better that way, otherwise her husband might have to know about it. She handed the deed to Dorothy and said "Be sure it is for our family." Dorothy said "Yes." San Tong and Leong Shee were both present and she did not remember that they said anything at that time.

In January, 1950, while Corinne was in Hong Kong she received a letter from Charles E. Cook, Jr., as attorney for San Tong, requesting that a new deed in favor of Jack be signed by her. Attorney Cook said in that letter "I am sure that you are familiar with the fact of the sale of the land here, belonging to the family, including yourself and Dorothy ..." The only enclosure was the deed of Lot 690 from Corinne to Jack, and, pursuant to the request in the letter, Corinne signed it. She mailed it to Dorothy, relying upon

her to see that Lot 690 and the proceeds of the sale were kept for the family. When she returned to California in September or October, 1950, she asked San Tong where the money from the sale of Lot 690 was. He said he was going to take care of the family with it and she believed and trusted him.

Dorothy testified that she saw Corinne sign the deed to Jack in July of 1942 and it was kept in the safe deposit box of Corinne and Dorothy until January, 1945, when San Tong asked Dorothy to let him hold it while she was back east attending Johns Hopkins University. He followed her to the bank, she got the deed out of the safe deposit box and handed it to him. That was the last she saw of it until the escrow in 1950. When, in 1950, Dorothy handed San Tong the new deed from Corinne to Jack, San Tong promised Dorothy that he would give May and her three girls some of the proceeds of the sale of Lot 690.

Other documents in evidence are a general power of attorney from Jack to San Tong, a grant deed from Jack (by San Tong under said power of attorney) to Southwest Properties, Inc., a letter dated March 10, 1950, from the escrow officer to Jack, handed to San Tong, his attorney in fact, mentioning a check for $107,633.71 enclosed, and cancelled checks from the escrow holder to Jack for $107,633.71, $8,475.11, and $5,000, or a total of $121,108.82, in addition to the $10,-000 received by San Tong for Jack outside of escrow.

No rents or profits of Lot 690 were paid to Corinne, either before or after her marriage, and none were ever paid to Jack. Up to the time of the sale in 1950 the improvements on Lot 690 were simple and cheap. Corinne, Dorothy, Jack and Joan, at the times of their marriages, ceased to live there. Using some of the proceeds of the sale, San Tong constructed on the unsold portion of Lot 690, a large home with swimming pool, patio, barbecue, fish pond and flower garden. He, his wife Ping, their four children, and Leong Shee were still living there at the time of the trial.

■ Appellants contend that a trust ''for the family'' is invalid because the term ''family'' is not a sufficient designation of the beneficiaries. While they have quoted many varying and different definitions of the word ''family,'' as said by the trial judge in his notice of ruling on the motion for new trial: ''. . . the question which confronts us is not how dictionaries, judges and lexicographers have defined the word in writings with which Jue Joe was wholly unfamiliar . . .'' but rather what was meant by Jue Joe when he taught Co-

rinne from babyhood that Lot 690 was "for the family" and on several occasions procured her solemn promise to him that she would hold it for the family and give it to them.

The trial court found that "the family" was understood by both the trustor and trustee to consist of Jue Joe's widow, his three children living at the time of his death in 1941, and the children of his deceased son; and that the property should be divided in five equal parts, one for Jue Joe's widow, one for each of his three children, and one to be divided between the children of his deceased son.

It is contended by appellants in their opening brief that, as a matter of law, Jue Joe was included in "the family" and his interest would have passed to Leong Shee at his death.

There is in the record no direct evidence that Jue Joe included himself among the beneficiaries of the trust, and it has been held by the California Supreme Court that no such presumption arises from the fact that an alien parent ineligible for citizenship paid the purchase price of land conveyed to his American-born child. (*Estate of Yano,* 188 Cal. 645, 650 [206 P. 995].) Nor did any such presumption arise from the fact that the alien father occupied the land. (*People* v. *Fujita,* 215 Cal. 166, 170, 171 [8 P.2d 1011].)

Appellants quote and rely upon the statement of the Supreme Court in *Hills* v. *Superior Court,* 207 Cal. 666, at page 668 [279 P. 805, 65 A.L.R. 266], that, "The husband, if living, is, of course, a member of the family." That statement, however, is dicta. The court there decided that the granting of a "family" allowance to a husband was not authorized by section 1466 of the Code of Civil Procedure. The provision of section 156 of the Civil Code that "The husband is the head of the family" is next quoted by appellants. That sentence is followed by the statement that "He may choose any reasonable place or mode of living, and the wife must conform thereto."

Other cases cited by the parties are to the effect that the "family" includes the husband (*Estate of Lamb,* 95 Cal. 397, 407 [30 P. 568]); relatives of a predeceased husband (*Estate of Watts,* 179 Cal. 20, 23 [175 P. 415]); an acknowledged illegitimate son taken into the family (*Estate of Lund,* 26 Cal. 2d 472, 494 [159 P.2d 643, 162 A.L.R. 606]); the acknowledged son of a bachelor and his house servant (*Estate of Gird,* 157 Cal. 534, 545 [108 P. 499, 137 Am.St.Rep. 131]); nieces and nephews and children of deceased nieces and nephews (*Estate of McCrum,* 97 Cal.App. 576 [275 P. 971]); and that the

"family" does not include one's brothers and sisters when one is married and has children of her own (*Estate of Bennett*, 134 Cal. 320, 323 [66 P. 370]); or a debtor's mother living apart from him (*Lawson* v. *Lawson*, 158 Cal. 446, 449-451 [111 P. 354]).

Obviously, whether Jue Joe intended to include himself among the beneficiaries designated by him as "the family" is not concluded by any of the above mentioned statutes or decisions. His intention as expressed to Corinne was a question of fact to be determined by the trial court.

█ The phrases "the family," "my family" and "our family" do not necessarily include the head of the family or the speaker. The words must be construed with reference to the circumstances under which they are used. █ Considering all the evidence before the court in the instant action, including Jue Joe's pride in the American citizenship of his daughters and grandchildren, the court's knowledge that any interest of a Chinese alien in California land was then subject to escheat proceedings, the inference is not only warranted but practically inescapable that Jue Joe, smart business man that he was, intended to exclude from "the family" who were the beneficiaries of the trust not only himself but also his wife and sons who were born in China.

We are convinced that the evidence is sufficient to support the finding and conclusion of the trial court that Jue Joe himself was not included in "the family" as used by him in naming the beneficiaries of the trust.

Since no claim is made on the instant appeal that either San Tong or Leong Shee was entitled to less than the interest given by the judgment, it is not necessary to determine whether the evidence was sufficient to support the finding that they were intended by Jue Joe to be included in "the family" as beneficiaries.

Appellants cite as error the trial court's decision that Sam's children were intended to participate as beneficiaries. They urge that, if those grandchildren of Jue Joe are entitled to participate in the division of the trust property, they should share equally with the other members of the family, and not take "in the right of Sam" who died in 1933.

█ Whether Jue Joe intended Sam's children to benefit from the trust is a question of fact to be determined from the evidence. There is testimony that Corinne and Dorothy believed he did, and that San Tong promised in 1950 that he would see that they received a share of the proceeds of the

sale of Lot 690. The inference was properly drawn that Sam's children were part of the family and entitled to share in the benefits of the trust.

Since no member of Sam's family has appealed, and the appellants were not prejudiced by Sam's family getting only one-fifth of the beneficial interest in the trust property instead of the three-sevenths to which they would have been entitled had they shared equally with Leong Shee, San Tong, Corinne and Dorothy, we will not further discuss that portion of appellants' argument.

From a study of the cases cited and others, as well as the evidence before the court, we find no reason to reverse the judgment because of any uncertainty as to who were the members of "the family" entitled to benefit from the trust.

While appellants mention in their briefs that they consider the trust as to Lot 690 uncertain as to its purpose and duration also, it is difficult to follow their reasoning in that regard. There is evidence before the court that Lot 690 was used as the family home and for the purpose of growing asparagus for the family business from 1919 until 1950, that San Tong then sold 35 of its 50 acres, appropriated the proceeds of the sale, had title to the remaining 15 acres conveyed to Jack, and took exclusive possession of the unsold portion himself. The practical construction given the trust by Jue Joe, Corinne, San Tong, Jack and Dorothy, seems to have been sufficiently certain. Lot 690 was to be used as the family home and for the growing of asparagus so long as that should be best for the family. From Jue Joe's death in 1941, San Tong, himself, used Lot 690 as the family home and for the raising of asparagus. In 1950 when the land was no longer suitable for the growing of asparagus and was in demand for subdivision, San Tong arranged the sale. Apparently then all agreed that the time had come for the sale of the land and the closing of the trust. At the request of San Tong's attorney, Corinne then in China executed a deed to Jack, sent it to Dorothy, who in turn handed it to San Tong. San Tong then stated to Dorothy that the proceeds of the sale would be for the family including Sam's children. San Tong was trusted by the entire family to manage the sale and at the same time trusted with Jack's general power of attorney. All trusted San Tong to see that the beneficiaries received their respective portions of the proceeds of the sale. The trial court found no uncertainty in these respects, and none appears upon the instant appeal.

As authority for reversal, appellants cite and rely upon the following decisions: *Wittfield* v. *Forster,* 124 Cal. 418 [57 P. 219]; *Sheehan* v. *Sullivan,* 126 Cal. 189, 192 [58 P. 543]; *Lefrooth* v. *Prentice,* 202 Cal. 215, 227-228 [259 P. 947]; *Estate of Ralston,* 1 Cal.2d 724, 726 [37 P.2d 76, 96 A.L.R. 953]; *Estate of Zilke,* 115 Cal.App. 63 [1 P.2d 475]; and *McElroy* v. *McElroy,* 32 Cal.2d 828, 831 [198 P.2d 683].

As to facts and relief sought, the instant action differs from the decisions last above cited. The *Wittfield* v. *Forster* case, *supra,* sought to cancel a deed absolute and quiet title in an alleged beneficiary of the land conveyed by a decedent. In *Sheehan* v. *Sullivan, supra,* there was no evidence of any declaration or understanding respecting any trust, even oral.

The evidence in *Lefrooth* v. *Prentice, supra,* was that the purported donor and trustee of securities made no declaration of trust, even oral, remained in possession and control and made no accounting after their sale; that instead he claimed unsuccessfully that a ranch purchased in his own name was purchased with the proceeds of the securities and was held by him in trust for his children, and therefore was exempt from execution on outstanding judgments against him.

Mr. Chief Justice Waste, speaking for the Supreme Court, in *Estate of Ralston, supra,* where the pertinent provision of decedent's will gave to the named executor "in trust" with "absolute authority to dispose of my entire estate as he may see fit" and "as I could if I were still alive," upheld the decision of the trial court that "The 'trust' here involved is defective and invalid because of its complete failure to indicate either the object or the persons to benefit thereby."

*Estate of Zilke, supra,* involved a bequest to "Offens home of San Francisco," and no evidence had been offered to remove the ambiguity as to testator's intended beneficiary. On appeal the decree distributing the estate to seven orphans homes in San Francisco was reversed with directions that evidence of testator's intention be received if offered.

*McElroy* v. *McElroy, supra,* affirmed a money judgment against the parents of defendant husband in a divorce action for the reason that the wife was also a beneficiary of the community funds left in trust with them by their son, her husband.

We consider none of the cited decisions applicable to the facts of the instant action. We are persuaded by the entire record on the instant appeal that it was not error for the court to enforce the trust in favor of the "family" of Jue Joe.

## TULARE PROPERTY

In regard to the Tulare property, a 90-acre farm near Porterville, in Tulare County, California, the trial court found and determined:

(1) That about the year 1933, a lease, and thereafter an agreement for the purchase of the Tulare property from one Scott Manlove were entered into in the name of San Tong;

(2) That San Tong for a long time has been in possession of said property;

(3) That Dorothy is the owner thereof;

(4) That between December 8, 1942, the date of the deed from Manlove to Dorothy, and August 24, 1948, the date of Dorothy's deed to San Tong, Dorothy was the owner of the property subject only to the purchase money trust deed executed by Dorothy in favor of Manlove upon which the last payment was made in 1944;

(5) That no adverse claim of ownership was made by San Tong or anyone else prior to August 24, 1948, when San Tong induced Dorothy to execute the deed to him by threats of physical violence which caused her to fear bodily injury and possible death at his hands;

(6) That Dorothy's consent and execution of the deed were not "real or free" but solely because of her fear of unlawful and violent injury; that San Tong intentionally induced such fear for the purpose of forcing Dorothy to execute said deed; and that any reasonable person situated as was Dorothy would have been in like fear of San Tong;

(7) That after she had consulted attorneys and been advised as to the remedy available, Dorothy immediately rescinded her deed to San Tong;

(8) That San Tong, ever since August 24, 1948, has used said land solely for his own profit and benefit and has not accounted to Dorothy for any part thereof;

(9) That since August 24, 1948, San Tong has been a trustee for Dorothy;

(10) That from the date of the filing of the instant action, September 16, 1952, to the date of the trial, March 1, 1957, the value of the use of the property to San Tong was $23,011.06, actually collected by him in cash from persons to whom he rented the property, from which amount there should be deducted $4,082.26, the amount paid by him for taxes and maintenance during that period, leaving a balance of $18,928.80, which should be paid by him to Dorothy for the use of the land from September 16, 1952, to March 1, 1957.

It is urged by appellants that since the finding of a gift from Jue Joe to Dorothy is supported only by the testimony of Dorothy, and Dorothy's testimony is so improbable as to be wholly unbelievable, the court's finding and decision that Dorothy was the owner of the Tulare property is without the support of any substantial evidence and must be reversed on the instant appeal.

In their opening brief they state that "the great current of the evidence is against a gift and the only evidence which it can be contended brings the case within the rule which governs in cases where there is a *material* conflict of evidence is the uncorroborated testimony of Dorothy that her father gave her the property and that San Tong subsequently acquiesced."

In this regard, appellants quote from and rely upon *Estate of Tarrant,* 38 Cal.2d 42, 51 [237 P.2d 505, 28 A.L.R.2d 419], wherein the Supreme Court said: "While it is true that 'the findings of the trial court will not be disturbed on appeal if the record discloses substantial evidence to support them,' . . . such rule has no pertinency where the evidence without conflict clearly establishes the impropriety of the inferences drawn by the court from the uncontroverted facts."

Cited by appellants in the same connection are the following decisions:

*People* v. *Haydon,* 18 Cal.App. 543, 555-556 [123 P. 1102, 1114], from which we quote: ". . . A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do."

*People* v. *Erkinger,* 119 Cal.App.2d 551, 555 [259 P.2d 492], from which we quote: ". . . Where the testimony of a witness . . . accords with facts established by other proof or with well known physical laws or laws governing human conduct, then it is not inherently improbable . . ."

*Kircher* v. *Atchison, T. & S. F. Ry. Co.,* 32 Cal.2d 176, 183, 184 [195 P.2d 427], from which we quote: ". . . Although an appellate court will not uphold a verdict or judgment based upon evidence inherently improbable . . ., unless we can say that plaintiff's version of the accident was wholly unacceptable to reasonable minds, we cannot set aside the jury's implied acceptance of it. . . ."

"It is true, that as related by plaintiff, the manner in which the accident happened appears to have been most extraordinary. But as stated in *Neilson* v. *Houle* (200 Cal. 726, 729 [254 P. 891]) 'common experience and observation teach us that strange and astonishing things sometimes happen . . .''

The reasons assigned by appellants for the improbability and unbelievable character of Dorothy's testimony are:

(1) There was no reason for a gift to Dorothy;

(2) The Tulare property had not been paid for in full when Jue Joe is said to have told Dorothy he was giving it to her;

(3) A gift to Dorothy would defraud Leong Shee of her community interest;

(4) If the property had been given to Dorothy by Jue Joe, San Tong would not have done these things: (a) paid for the Tulare property with his own money; (b) worked for years in the cultivating and farming the property without compensation; and (c) made extensive improvements and repairs at his own expense and without consulting Dorothy; and

(5) If the property had been given to Dorothy by Jue Joe, Dorothy would not have done these things: (a) permitted San Tong to retain all rents and profits for many years without insisting on an accounting; and (b) conveyed the property to San Tong's children at San Tong's insistence when she was going to Johns Hopkins to study.

As "applicable" to the first, second and third reasons given, appellants in their opening brief quote from *Hansen* v. *Bear Film Co.*, 28 Cal.2d 154, 170-172 [168 P.2d 946], an excerpt which includes the following: ". . . Oscar Hansen was not the man to do this thing. With all his devotion to his mother, he was not the person to turn over to her as a cold gift practically everything he had in this world. With what the evidence shows of his temperament, disposition and traits,—particularly his tremendous ambition, and his determination to eliminate competition in his line, all these things, coupled with the fact that he had made it all 'the hard way,' and after a very tough struggle, it simply cannot be concluded, . . . (that he decided) to immediately give away the whole thing, 'lock, stock and barrel' to his mother, who was already apparently living comfortably and with a sufficiency considering her modest needs. If there ever was an improvident gift this would be it . . .

"It is thus apparent that the evidence gives rise to the

inference that the transfers made by Oscar to Josephine were transfers of legal title only, and that Oscar at all times intended to and did retain the full beneficial ownership.''

■ Appellants' first, second and third reasons are not persuasive. Jue Joe could not own land in California. He loved the land and he loved his daughters who could own it. He made an absolute gift to Corinne and Dorothy of Lot 691 adjacent to Lot 690, which he put in trust with Corinne for ''the family,'' as hereinbefore set forth. He gave Dorothy an automobile upon her graduation from high school. He took care of San Tong's two oldest children and made a home for them from the death of their mother until his own death. He ''helped'' San Tong to go to China for his second wife, Ping. Such a man needed no special reason to make an additional gift to his youngest child.

In *Back* v. *Farnsworth*, 25 Cal.App.2d 212, 218, 219 [77 P.2d 295], not cited by the parties, it is held that testimony that plaintiff had completely paid for real property bought on contract from decedent, that some months before her death she had given plaintiff all her papers referring to the property and told him she would sign a deed whenever he brought one to her, and that he had failed to ask for the deed before her death, is not inherently improbable, especially in view of their lack of acquaintance with legal proceedings or the formal requirements of transferring title to real property, remembering that plaintiff, decedent and her husband were good friends from the same country, that they were not well educated, and that they expressed themselves in English with great difficulty.

In considering the improbability and unbelievable quality of Dorothy's testimony concerning the Tulare property, the court had before it the entire record which included satisfactory proof that Jue Joe had bought property having title put in Woi King, a Chinese friend who was an American citizen, and later had sold that property receiving the consideration himself; that he had bought Lot 691 having title put in the names of his two baby daughters, for whom guardians had then been appointed; that as to Lot 691 the girls were taught from childhood that it belonged to them; that he had bought Lot 690, having title put in trust in the name of Title Insurance and Trust Company for the benefit of his friend, Brant, who in turn and at almost the same time made an informal and unrecorded assignment of beneficial interest to Corinne; that although Corinne was taught from babyhood

that she owned Lot 690 and must give it to the family, she received legal title from the title company after she was 21 years of age; that several years before his death, Jue Joe told Dorothy the Tulare property was to be hers; that when Dorothy became 21 years of age in 1942, title to the Tulare property was put in her name; and that, according to her testimony, San Tong then told Dorothy that Jue Joe had told him the property was hers and to have the title put in her name. While no assignment of beneficial interest, or document naming the person to take title to the Tulare property appears in the record, in many respects this deal parallels other deals made by Jue Joe. Most of the purchase price of Lot 690 remained unpaid in 1921 when the informal assignment to Corinne of the beneficial interest was made by Brant, who acted as nominal beneficiary to aid his friend Jue Joe. It must be remembered that Jue Joe spoke very little English and wrote and read none, and that he had depended upon his friends and relatives to handle many things for him. It is not improbable or inherently unbelievable that he so depended upon his son, San Tong, in the purchase of the Tulare property for Dorothy.

With regard to the Tulare property as with Lot 690, Jue Joe retained no power in himself to prevent title going to his daughter upon her 21st birthday. It seems to us probable, considering the Alien Land Law of that time, that Leong Shee fully acquiesced in the gift to Dorothy. Apparently, Jue Joe, Dorothy and San Tong so understood.

From Jue Joe's death in 1941 to 1948, San Tong's right to exercise all the powers and prerogatives of the ''head'' of a Chinese family was not questioned by anyone. He ran the family home on Lot 690, which Corinne held in trust for the family; he ran the business of growing asparagus and other vegetables for market upon Lot 690, upon Lot 691, which belonged outright to Corinne and Dorothy, and upon many other properties theretofore farmed by Jue Joe, including the Tulare property; he marketed the produce from all the properties through the Jue Joe Company business at Central Market in Los Angeles; he furnished his mother and sisters with money needed by them, had them sign income tax returns showing that they were partners in Jue Joe Company, and told Dorothy there would be an accounting later.

In 1942, Corinne, to protect the family's beneficial interest in Lot 690, at San Tong's request made a deed to Jack and left it with Dorothy. Later Dorothy, also at San Tong's request, made a deed of the Tulare property to Guy and Soo

Jan, and left her own and Corinne's deed with San Tong for safekeeping.

San Tong's good faith, honesty and efficiency were not questioned until he threatened Dorothy's safety and her life to procure her deed to himself of the Tulare property in 1948.

It is appellants' contention that San Tong, and not Jue Joe, bought and paid for the Tulare property, and in this connection they say "Respondents cannot dispute the physical evidence in Jue Joe's own handwriting, that the $4,000 check of Jue Joe to Manlove was a loan to San Tong. That appears from Jue Joe's Chinese writing on the check stub 'Tong owes money.' "

Considering the record as a whole, including San Tong's ability to produce exhibits (even personal letters many years old) to strengthen his own claims, his failure to produce from records which had admittedly been in his possession the items requested by respondents, his own conflicting statements, his taking possession of all the contents of his father's safe deposit box after his death and before the bank learned of it, his assumption with the passive consent of his mother and sisters of complete control of the family property, money, records, and business, his representations that his mother and sisters were partners, his advancing to his mother and sisters the moneys needed by them, his statements to Dorothy that they would all have an accounting later, and the trial court's determination that much of his sworn testimony was untrue, there seems to be no reason why respondents, and the court, should not doubt that the Chinese writing on the check stub was that of Jue Joe, or was placed on the stub at the time his check was drawn and sent to Manlove as the down payment on the Tulare property, or that San Tong ever paid the $4,000 to Jue Joe, or that the other payments upon the purchase price made by the Jue Joe Company were made with San Tong's money.

San Tong's contention is that the Tulare property belongs to him because he paid for it with moneys of the Jue Joe Company; "but this contention is based upon the premise that after 1928 he was the sole owner of the business." The court found that Jue Joe was the sole owner of the business up to the time of his death in 1941. Consequently, the payments on the Tulare property prior to his death were made by him. There is evidence that Jue Joe had told both San Tong and Dorothy that he was buying the land for Dorothy and that he was relying upon San Tong, named in the contract as

buyer with the right to name the grantee, to have it conveyed to Dorothy when she became 21 years old; and that, in 1942, when Dorothy was 21 years old and the contract required that Manlove convey the property subject to a trust deed, San Tong, pursuant to his father's instructions had the property conveyed to Dorothy, and Dorothy executed the note and trust deed required by the contract. At the time of Jue Joe's death in 1941, Jue Joe's property, money and business became . the property of Leong Shee. She had acquiesced in the gift of the Tulare property to Dorothy, and by her pleadings she waived any interest she had in the business. San Tong, according to Dorothy's testimony, and other evidence, took over the active management of all Jue Joe's property and business, represented the other members of the family as partners, told Dorothy that the money paid on the Tulare property after 1941 was from her share in the "family business," on which there would be a later accounting. ■ Leong Shee's waiver of her rights in the Jue Joe Company, not put in issue on the instant appeal, must be presumed to include any right she might otherwise have had in the Tulare property because of the payments thereon made by the Jue Joe Company after the death of Jue Joe. There is no evidence that she retained any greater rights as to the money of Jue Joe Company used to pay for the Tulare property given to Dorothy, than as to the property and money of Jue Joe Company appropriated by San Tong.

Appellant's claim that it cannot be believed that San Tong would have farmed the Tulare property without compensation if it had been given to Dorothy by Jue Joe, completely ignores the evidence and finding that, in the few years between the dates of the filing of the instant action and the trial thereof, San Tong rented the Tulare property to other farmers, paid for upkeep and taxes, and made a net profit from the land of some $18,000.

■ It is urged by appellants that "equity will not give effect to an imperfect gift by enforcing it as a trust." (*Estate of Alberts,* 38 Cal.App.2d 42, 46 [100 P.2d 538].)

Equity in the instant action was not required to enforce the trust as, under the court's findings and decision, San Tong, by his nomination of Dorothy to receive the legal title and his conversation with her about it, voluntarily performed his duty as his father's trustee.

■ Appellants argue at length that any interest Jue Joe had in the Tulare property at the time of his death descended

to Leong Shee. No interest has been shown to have been in Jue Joe at the time of his death. In all of his dealings in interests in real property, including leases, even before the birth of Corinne who was the first American born member of his family, he carefully refrained from taking any interest in himself. It is only reasonable to imply that the deal as to the Tulare property was arranged the same way. Jue Joe was meticulous in avoiding any violation of Alien Land Law. Whether San Tong previously intended to violate Jue Joe's trust in him, and regardless of his reasons for so doing, he lived up to his father's trust in him when he had Manlove deed the Tulare property to Dorothy in 1942, just as Brant and the Title Company had done in conveying Lot 690 to Corinne when she became 21 years of age.

 Appellants in their closing brief state that "there is not a scintilla of evidence to the effect that Dorothy was intended owner of the Tulare property until 1939, at the earliest." This overlooks the evidence before the court of the previous dealings of Jue Joe and the trial court's right to presume therefrom that he would not have told Dorothy in 1939 that the Tulare property was to be hers had he not previously arranged to have it so and made the payments required up to that time. It also ignores the evidence of the character of the previous dealings of San Tong and the inferences the court evidently drew from his statement to Dorothy that the property was hers.

Appellants rely somewhat upon the testimony of Manlove that he knew no one save San Tong in the deal. When it is remembered that as to Lot 690, purchased by Jue Joe through his friend Brant and the Title Company, Corinne's name did not appear of record until after she was 21 years of age, and that the seller probably never heard of her, it is not improbable that Jue Joe believed the Tulare property was being purchased for Dorothy under similar arrangement.

 Appellants contend that Dorothy's interest in the Tulare property rests upon her own uncorroborated testimony alone. This ignores the fact that San Tong did have the title transferred from Manlove to Dorothy and, according to Dorothy, her husband and Corinne, he made no claim of ownership of the property until 1948 when by threats he procured a deed from Dorothy. Also, the conflicts in San Tong's testimony warranted the trial court's failure to take it at face value.

 Appellant insists that Leong Shee knew nothing of a

gift of the Tulare property to Dorothy. We find nothing in her testimony to that effect, and in view of the Alien Land Law of that time we think the trial court justified in inferring from the evidence before it that Leong Shee had acquiesced and joined with Jue Joe in making the gift to Dorothy.

Much is made by appellants of the fact that Jue Joe did not tell Dorothy when or how she was to become the owner of the Tulare property. This, to us, seems immaterial, since he apparently told San Tong when and how she was to take the title. It will be remembered that as to Lot 690, Jue Joe had given Corinne the impression that she always owned it, but he had carefully arranged with the trustee that she was to take legal title when she became 21 years old. He had arranged with San Tong for Dorothy to take legal title of the Tulare property when she became 21 years of age and the contract of purchase required Manlove to convey it to San Tong's nominee.

Appellants urge that "the instruction of Jue Joe to San Tong to 'turn' the property over to Dorothy was given to San Tong as *agent* for Jue Joe" (since San Tong could not convey the property and could only instruct Manlove to do so) "and the agency terminated with Jue Joe's death."

Since it has been finally determined that Leong Shee, the heir at law and successor to Jue Joe, has waived the claims she had against San Tong for his appropriation of the Jue Joe Company, Jue Joe's crops and other properties (except her interest in Lot 690), and no reason is given for exempting from such blanket waiver any claim she might have had against San Tong, Manlove or Dorothy arising out of San Tong's unauthorized instruction to Manlove, Manlove's compliance, or Dorothy's acceptance of the deed after Jue Joe's death, and no appellant other than Leong Shee having lost anything by San Tong's act, whether he exceeded his authority in that regard is immaterial to the issues raised on the appeal now engaging our attention.

In answer to appellants' arguments to the effect that Jue Joe's intended gift to Dorothy cannot be completed by the courts, respondent, in her brief, states: "Happily Dorothy has no occasion to sue for specific performance of Jue Joe's oral declaration of his intention to make a gift of the Tulare property to Dorothy, or to sue San Tong Jue for specific performance of his obligation to her as constructive trustee. San Tong Jue's voluntary act in meeting and fulfilling that obligation removed the necessity of suit on that score.

"Dorothy's suit is to recover from San Tong Jue the same property, wrongfully wrested by him from her after she had been in undisputed ownership of it for five years and eight months. The means used by San Tong Jue were extortionate and consisted of menace, causing fear and terror."

The court found on the testimony of Dorothy, her husband, and San Tong that the deed from Dorothy to San Tong on August 24, 1948, was procured by menace and threats of San Tong and Dorothy's fear induced thereby.

Respondents cite Civil Code, section 2224, as requiring the court to cancel the deed so obtained and award the Tulare property to Dorothy, as it did. They urge that San Tong's threats were such a wrongful act as to make San Tong an involuntary trustee of the Tulare property for the benefit of Dorothy. The only manner in which the transaction can be excepted from said section 2224 is by proving that San Tong has "some other and better right" to the Tulare property.

Appellants urge in their closing brief, that the "question as to who is the real owner of the Tulare property, regardless of whether record title stands in the name of Dorothy or San Tong" had to be decided in order to determine whether the cancellation of the deed from Dorothy to San Tong was warranted. San Tong, however, failed to prove "some other and better right" in himself, than the legal title acquired by his "wrongful act." Therefore, the deed from Dorothy to him was properly cancelled.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied September 22, 1958, and appellants' petition for a hearing by the Supreme Court was denied October 22, 1958.