[Civ. No. 5971.   Fourth Dist.   Mar. 6, 1959.]

E. R. ABBEY, as Public Administrator, etc., Respondent, v. JOSEPH R. LORD, Appellant.

500

Rimel & Johnston for Appellant.

James E. Walker for Respondent.

GRIFFIN, P. J. — In July, 1950, defendant-appellant Joseph R. Lord married Regina Dion. He had a separate estate of approximately $12,000, and she had one valued at approximately $20,000. In December, 1953, they separated under a property settlement agreement. They agreed to divide and apportion their properties in accordance with the contributions each had made to the common fund at the time of their marriage. Under the agreement defendant received about $12,338.87 and Mrs. Lord $20,958.83. An interlocutory decree of divorce was obtained by Mrs. Lord. They later agreed to return to live together as huband and wife and

according to Mr. Lord, in consideration of his returning to live with her, they agreed to pool their assets and that each would have a one-half interest therein. Later, some domestic or financial difficulty arose between them. On February 20, 1956, Joseph Lord killed his wife Regina. He was charged with murder and he entered a plea of guilty of manslaughter. The court determined the same to be voluntary. Probation was granted upon the condition, among other things, that defendant serve one year in the county jail. Thereafter, plaintiff, the public administrator, was appointed to administer her estate and brought an action against Joseph Lord to quiet title, to establish a constructive trust in the property, and to obtain declaratory relief.

After they resumed marital relationship and at the time of her death the parties owned, as tenants in common: (a) a fully paid investment certificate Number 10029, in the sum of $10,000; (b) investment certificate Number 11020 in the sum of $3,370.95; (c) investment certificate Number 9522 in the sum of $10,299.63; (d) a bank account in the sum of $2,323.77, claimed by Mr. Lord to be in joint tenancy with his wife; and (e) 500 shares of telephone stock valued at $5,000, likewise held in joint tenancy, all totaling $30,994.35.

The trial court found, after taking considerable evidence, that all of the property was owned by them as tenants in common except the 500 shares of telephone stock which was held in joint tenancy; that when defendant husband killed his wife, he destroyed the joint tenancy and thereby converted the stock into a tenancy in common; that it would be unconscionable for defendant to recover out of the common estate more than he ever owned of it or contributed to it; that he only contributed separate property worth 37 per cent of its total value and Regina contributed separate property worth 63 per cent thereof at the time of their marriage and each regained the same proportionate amounts by virtue of the executed property settlement agreement and that Regina Lord never made any gift or transfer of ownership of any of her separate property to defendant and at the time of her death she was still the owner of 63 per cent of the common estate held with defendant. Judgment was entered that plaintiff's title to 63 per cent of the common fund in cash value, equivalent to $19,526.44, be quieted, together with 63 per cent of the gross income accumulated since her death.

It is defendant's position that he was entitled to a one-half interest in items (a), (b), and (c), and was entitled to the

full amount of items (d) and (e) because of the joint tenancy holding, he being the survivor, citing such authority as *In re Foster's Estate*, 182 Kan. 315 [320 P.2d 855]; *Wenker v. Landon* (1939), 161 Ore. 265 [88 P.2d 971]; and *Oleff v. Hodapp* (1935), 129 Ohio St. 432 [195 N.E. 838, 98 A.L.R. 764]; *Smith v. Greenburg* (1950), 121 Colo. 417 [218 P.2d 514]; *Budwit v. Herr*, 339 Mich. 265 [63 N.W.2d 841].

Some question arises as to the nature of the holding in reference to item (d), the bank account. Plaintiff produced a banker who testified he opened the account for these parties on October 26, 1954, and prepared the signature card and ledger sheet; that Mrs. Lord did all of the talking about it even though Mr. Lord stood by and listened; that Mrs. Lord said she wanted to put the money in the bank so Mr. Lord could not get it without her knowing it or without her signature; that she referred to it as "my money"; that the bank used the same card for joint and common accounts; that the Lord transaction was unusual and that he explained to her that if he opened an account requiring both signatures neither could draw money without the signature of the other; and she said that was the way she wanted it. The ledger sheet used the word "and" between the two signatures and used no words indicating a joint tenancy account. It was marked "Both signatures required." The signature card reads in part as follows: "(1) That this account is to be carried by such bank as a commercial account . . . (2) That all funds now to the credit of or which may hereafter be placed to the credit of account are and shall be the property of the undersigned as joint tenants to be withdrawn as follows: . . . Both signatures required." In this connection the banker testified he asked Mrs. Lord if she wanted the account in joint tenancy; that he told her in that case what would happen to the money in the event of the death of one party and said it was unusual to open a joint tenancy account requiring both signatures; that she said she did not know what joint tenancy meant but she wanted it so arranged that both would have to sign for withdrawals.

Defendant Lord testified in reference to another bank account in Los Gatos opened by them in both names that he "didn't know anything about joint tenancy or joint accounts or anything like that"; that "it was both names" and he knew he did not have the privilege of withdrawing money from it without both signatures; that she could not do so

either; and that the account in the Santa Ana bank was opened under the same arrangement.

█ It is conceded that the telephone stock (e) was held in joint tenancy. Appellant contends that the taking of title in the name of the spouses as joint tenants is tantamount to a binding agreement between them that the same shall not thereafter be held as common property but instead as joint tenancy with all the characteristics of such an estate, citing *Siberell* v. *Siberell,* 214 Cal. 767 [7 P.2d 1003]; and *Schindler* v. *Schindler,* 126 Cal.App.2d 597 [272 P.2d 566].

While this is the general rule it has long been held that the character of property thus held may be changed by executed oral agreement between the parties. (*Hotle* v. *Miller,* 51 Cal. 2d 541 [334 P.2d 849]; *Woods* v. *Security-First Nat. Bank,* 46 Cal.2d 697 [299 P.2d 657]; *Jue* v. *San Tong Jue,* 163 Cal.App.2d 231, 253 [329 P.2d 560].) █ It has likewise been held that to create a joint tenancy interest it is necessary to comply with section 683 of the Civil Code. At common law, estates in joint tenancy were favored over tenancies in common, and it was necessary to add restrictive words to limit the grantees' estate to that of tenancy in common. This rule has been abrogated by statute in this state. The intention to create a joint tenancy must now appear expressly in the instrument. Without such a declaration there is no compliance with the statute and no joint tenancy results. (13 Cal.Jur.2d 287, 296; Civ. Code, § 686; *Reiss* v. *Reiss,* 45 Cal.App.2d 740, 747 [114 P.2d 718].) █ Section 852 of the Financial Code does not term the making of the deposit in a bank conclusive evidence of the intention of the depositors to vest title to the deposit in the survivor. This section superseded section 852 of the Banking Code in 1951, which section had superseded section 15a of the Bank Act. (*Paterson* v. *Comastri,* 39 Cal.2d 66, 70 [244 P.2d 902].) Parol evidence is competent to show the depositor's intention and equitable rights to the money.

█ See *Paterson* v. *Comastri, supra,* where it is said that any presumption of joint tenancy "may be overcome by proof that the owner-depositor, when making the deposit, had no intention to create a true joint tenancy." (See also *Comastri* v. *Burke,* 137 Cal.App.2d 430, 435 [290 P.2d 663]; *American Trust Co.* v. *Fitzmaurice,* 131 Cal.App.2d 382, 387 [280 P.2d 545]; *Estate of Dean,* 68 Cal.App.2d 86, 97 [155 P.2d 901]; *Anderson* v. *Broadwell,* 119 Cal.App. 150 [6 P.2d 267].)

In view of the evidence and circumstances related, the trial court was not bound to accept the testimony of Mr. Lord

that his wife Regina said she was making a gift of a portion of her separate property to Lord, or that they thereafter agreed to hold their property "fifty-fifty." (*Harlow* v. *United Title Guar. Co.*, 145 Cal.App.2d 672, 675 [303 P.2d 16].)

In *Hill* v. *Thomas*, 135 Cal.App.2d 672, 681 [288 P.2d 157], the court held that the uncorroborated testimony as to an oral declaration of a deceased person is the weakest form of evidence and is open to suspicion; but where admissible, it may be weighed by the trier of facts the same as other evidence and may be disregarded where shown to be unconvincing or insubstantial, or because of the witness's interest in the outcome of the case and close relationship. (See also *Khoury* v. *Barham*, 85 Cal.App.2d 202, 211 [192 P.2d 823].) It may be further observed that even Lord's testimony, set forth in his deposition, indicates that he was at least in doubt as to the intended nature of the joint tenancy bank account.

Although it might well appear that a joint tenancy account was never intended we conclude, under the reasoning hereinafter expressed in respect to the claimed destruction of the joint tenancy holding pertaining to item (e), the telephone stock, it will be unnecessary to determine this issue.

Appellant urges in substance this proposition, that the logic of the strict common-law rule must be applied to any apparent joint tenancy title; that therefore defendant is the sole owner of any property so held at the instant he killed the other joint tenant, and argues against the weight and trend of authority. It seems to us he is opposed by modern views. The decisive fact in the case at bar is the voluntary, unlawful, and felonious killing of one joint tenant by the other as distinguished from an unintentional killing. It appears that defendant stabbed his wife with a butcher knife in the abdomen and throat, causing her immediate death, in an argument over the deceased wife's refusal to join with him in signing a check drawn on the joint tenancy account here involved. The controlling facts cannot possibly be disregarded in a just determination of this case. Conversely, there would seem to be no justification whatsoever for disposing of this case as though Regina Lord had died of natural causes, for no amount of lucubration can dissolve the crucial distinction in circumstances. The general subject of acquisition of property by one who has feloniously killed the owner is exhaustively treated in Scott on Trusts, 2d edition [1956], volume IV, chapter 13, Constructive Trusts, and particularly at sections 492, 493 and 494. There is a conflict of authority, in the absence of any

statute, as to acquisition of property by testate or intestate succession where the decedent is killed by a legatee or heir, but most jurisdictions apply the constructive trust theory that where a murderer attempts to acquire title to property by virtue of his crime and to keep it he takes the property but holds it upon a constructive trust. In Scott on Trusts, *supra*, page 3181, it is said:

"Where the Statute of Wills and the statute of distributions make no provision as to the effect of murder of the decedent by the legatee or heir, the property passes under the will or by intestacy to him. It is then that the equitable principle as to unjust enrichment becomes applicable. That principle is as applicable where the title to property is acquired by murder as it is where the title is acquired by fraud, duress or undue influence. By imposing a constructive trust upon the murderer, the court is not making an exception to the provisions of the statutes, but is merely compelling the murderer to surrender the profits of his crime and thus preventing his unjust enrichment."

More than half of the states have a statute similar to California Probate Code, section 258. This section was added in 1905 as Civil Code, section 1409. It disinherited one who had been convicted of murder. The Supreme Court refused to extend the section to manslaughter. In *Estate of Kirby*, 162 Cal. 91, 94 [121 P. 370, Ann.Cas. 1913C 928, 39 L.R.A.N.S. 1088], it is said: "The statute having made the distinction between murder and manslaughter, the courts cannot ignore it. . . ." Also cited by appellant is *Budwit* v. *Herr*, 339 Mich. 265 [63 N.W.2d 841]; and *Smith* v. *Greenburg* (1950), 121 Colo. 417 [218 P.2d 514]. (See also *Estate of Lysholm*, 79 Cal.App.2d 467 [179 P.2d 833]; and *Estate of Daniels* (1953), 120 Cal.App.2d 284 [260 P.2d 991].) Probate Code, section 258, was amended in 1955, and disinherison was extended to one convicted of voluntary manslaughter. This amendment clearly establishes that the Legislature does not favor the policy of giving property benefits to murderers or persons convicted of voluntary manslaughter. Section 2224 of the Civil Code reads as follows: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

"Section 3517 of the Civil Code provides: "No one can take advantage of his own wrong.""

The application of these sections was not discussed in *Estate of Kirby, supra. Estate of Lysholm, supra,* involved an involuntary manslaughter case. It does not involve the same kind of moral turpitude present in a voluntary killing. *Estate of Daniels* (not considered by the Supreme Court, and decided before the amendment to Prob. Code, § 258, in 1955), did refer to section 3517 of the Civil Code, and in disposing of this contention said, at page 293: "Whether this accords with natural right and justice is a question upon which we cannot enter. The right of inheritance in this state does not depend upon the ideas of court or counsel as to justice and natural right." In relation to insurance the overwhelming weight of authority and the California rule is that the killer will be precluded from receiving and keeping the proceeds of the policy; and that a constructive trust is imposed. (*Beck* v. *West Coast Life Ins. Co.,* 38 Cal.2d 643, 645 [241 P.2d 544, 26 A.L.R.2d 979]; Scott on Trusts, §§ 494 et seq., p. 3208; *Mutual Life Ins. Co.* v. *Armstrong,* 117 U.S. 591, 600 [6 S.Ct. 877, 881, 29 L.Ed. 997].)

In the Beck case, *supra,* the court said: " ' [W]here the defendant has by his own wrong obtained the legal title to property, a trust as to such property will be imposed upon him in favor of the party injured. This principle is a familiar one and is based upon the maxim, which has been carried into our code (Civ. Code, § 3517), that no one may profit by his own wrong.' "

In the New York Mutual Life Insurance Company case it was said at page 600: "It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired."

A careful examination of the authorities of this state fails to reveal a reported decision upon the precise question before the court. While section 258 of the Probate Code has no direct application, section 2224 should be directly applicable. If not, the question then is, in the absence of statute, does one who feloniously kills his spouse, and thus survives such spouse, thereupon become the sole owner of joint tenancy property? It is difficult to conjure any real distinction here between a tenancy by the entireties, and a joint tenancy, or the rationale of the cases that deal with one common-law form or the other. It would seem that at least to the extent to which the interest of the surviving joint tenant is enlarged,

the killer should be compelled to hold under a constructive trust, whether drawn from a statute or general equitable principles. (*Vesey* v. *Vesey*, 237 Minn. 295 [54 N.W.2d 385, 32 A.L.R.2d 1090] ; *National City Bank of Evansville* v. *Bledsoe* (Ind., 1957), 144 N.E.2d 710; 3 Scott on Trusts, §§ 493, 493.2; 3 Bogert, Trust and Trustees [1946], § 478, pp. 56, 57; Cardozo, The Nature of the Judicial Process (Yale Univ. Press, 1921), pp. 40, 43.)

In *Vesey* v. *Vesey, supra*, it is said at page 389: ". . . Because the problem of preventing one from acquiring various types of property by feloniously causing the death of another are complex, it would be desirable to have all questions, rather than only those relating to estates of decedents and insurance proceeds, governed by legislation. But, until the legislature acts, this court can, by imposing a constructive trust, prevent the repugnant result that one joint owner of a bank account may take the whole account by right of survivorship after feloniously causing the death of the other joint owner."

In *National City Bank of Evansville* v. *Bledsoe, supra,* at page 714, it is said: "Is there any valid reason why the well-settled equitable principle that 'equity will not permit a person to profit by his own wrong at the expense of another', should not be applicable to an estate by entireties terminated by murder? There is no doubt the murderer in reality has profited from illegally causing the death of the victim spouse, as he has become the sole and exclusive owner of the fee, which he could thereupon alienate or dispose of as he alone saw fit . . . And while according to the strict common law fiction, the murderer may not have profited or benefited, on the theory that he was, during the marriage, the owner per tout of the property, equity looks to the substance and not the form, and should not condone by a common law fiction the fact that the wrongdoer has actually benefited by his own wrongful conduct."

The courts have invented ingenious theories to support a constructive trust. Some courts erect a conclusive presumption that decedent would have outlived the killer. (*Neiman* v. *Hurff,* 11 N.J. 55 [93 A.2d 345, 348].) If this is to be applied in the instant case, Regina Lord was 65 years of age and Joseph 69 at the time of her death, and under that theory the probability would be that Regina would have outlived her husband and come into the entire joint tenancy property had he not taken her life. That the killer is the

trustee of the victim's one-half interest appears to be the rule most frquently adopted. Opposed to defendant's position are all of the states that have so far passed on the question and adopted a constructive trust principle to prevent the killer from profiting from his crime, namely, Delaware, Florida, Illinois, Indiana, Kentucky, Minnesota, Missouri, New Jersey, New York, North Carolina and Wisconsin, and the following eminent authorities: Restatement; Legal Scholars, Ames, Bogert and Scott, and Mr. Justice Cardozo; *Ashwood* v. *Patterson* (Fla., 1951), 49 So.2d 848; *Bradley* v. *Fox* (1955), 7 Ill.2d 106 [129 N.E.2d 699]; *National City Bank of Evansville* v. *Bledsoe* (Ind., 1957), 144 N.E.2d 710; *Cowan* v. *Pleasant* (Ky.App., 1954), 263 S.W.2d 494.

The action here interposed is an equity case. It was said in *Humboldt Savings Bank* v. *McCleverty*, 161 Cal. 285, 292 [119 P. 82]: ". . . It has always been the pride of courts of equity that they will so mould and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." (Citing authorities.)

To the same effect is *Neiman* v. *Hurff*, 11 N.J. 55 [93 A.2d 345, 347], where it is said: "To permit the murderer to retain title to the property acquired by his crime as permitted in some states is abhorrent to even the most rudimentary sense of justice. It violates the policy of the common law that no one shall be allowed to profit by his own wrong 'nullus commodum capere potest de injuria sua propria,' . . ." (Citing cases). See Ames, Lextures on Legal History [1913], 310, at 321, entitled "Can a Murderer Acquire Title by his Crime and Keep it?"

In *Bradley* v. *Fox, supra,* considering a similiar question involving a joint tenancy deed, the court concluded, at page 706: "In so construing the rights of the parties to deny a murderer the fruits of his crime, this court is functioning, not as a 'theological institution,' as suggested in the Ohio case cited by defendants, but as a tribunal dedicated to the adjudication of law, for effecting justice is not a novel role for the courts, nor one transcending the sphere of other institutions."

In the instant case the trial court concluded that the joint tenancy in the stock was destroyed and terminated by the act of killing the decedent. The court converted the joint tenancy into a tenancy in common. As readily the court could have found the joint tenancy was preserved and that the defendant

was a constructive trustee, and that half or all of the property passed thereby to plaintiff. The court, however, adopted a practical solution fairest to the plaintiff and to the defendant. This court does not believe that it should countenance the addition of homicide as the approved method of terminating a joint tenancy without affecting the results found by the trial court.

It will be remembered that defendant's contention was that his wife, after making the property settlement agreement, later told him if he would return to her she would make a gift of some of her property to him so they would hold their property "fifty-fifty" and that she later did make such a gift and division. Of course the decedent herself was unable to personally rebut that testimony. Over objections of defendant, plaintiff produced witnesses who testified that in December, 1955, after the placing of the stock in joint tenancy, Mrs. Lord told them she was worried because she had dividend checks coming from that stock and she had not received them and she had an idea defendant had taken them. The witness testified that when the Lords sold their home she wanted to keep her money separate from his but defendant would not agree, and about four months before she was killed Mrs. Lord told her they had agreed on a divorce but Mr. Lord wanted half of the property and she wanted all of her property which was more than half. The argument is that this conversation was hearsay and self-serving, not being in the presence of defendant, and that the hidden intention of one party, not disclosed by the other, was not admissible, citing *Tomaier* v. *Tomaier*, 23 Cal.2d 754 [146 P.2d 905]; and *Watson* v. *Peyton*, 10 Cal.2d 156 [73 P.2d 906].

It is the general rule that evidence of intention or mental state of a person at a particular time, when material to an issue under trial, is admissible. (*Estate of Carson*, 184 Cal. 437 [194 P. 5, 17 A.L.R. 239].) The trial court was entitled to draw from this evidence an inference that there never was an oral agreement to divide the property fifty-fifty, as claimed by the defendant and that Mrs. Lord never intended to make a gift of it to him. (*Pailhe* v. *Pailhe*, 113 Cal.App.2d 53, 63 [247 P.2d 838], and cases cited; *American Trust Co.* v. *Fitzmaurice*, 131 Cal.App.2d 382, 386 [280 P.2d 545]; *Donlon* v. *Donlon*, 140 Cal.App.2d 428 [295 P.2d 51]; *Schindler* v. *Schindler*, 126 Cal.App.2d 597, 602 [272 P.2d 566].)

510

No prejudical error appears in the reception of evidence and no miscarriage of justice has resulted. We conclude that the trial court applied the sound equitable principles that a man should not profit from his own crime and that no common-law fiction ought to impair the judgment.

Judgment affirmed.

Mussell, J., and Shepard, J., concurred.