[No. D022217. Fourth Dist., Div. One. Nov. 16, 1995.]

Estate of GUISEPPE CASTIGLIONI, Deceased.
ANNIE J. CASTIGLIONI, Petitioner and Respondent, v.
ELIZABETH DEL POZO, as Special Administrator, etc., Objector and
Appellant.

COUNSEL

Garry J. Bowman for Objector and Appellant.

Atherton, Allen & Geerdes and Franklin Geerdes for Petitioner and Respondent.

OPINION

**NARES, J.**—We here deal with the disposition of property that was joint tenancy property after there has been a felonious, intentional killing of one joint tenant spouse by the other, a factual pattern subject to Probate Code[1] section 251. As a matter of first impression we give effect to relatively new developments in California law concerning tracing contributions to jointly held property in order to determine entitlement to the property after the killing.[2]

Section 251 provides in part: "A joint tenant who feloniously and intentionally kills another joint tenant thereby effects a severance of the interest of the decedent so that the share of the decedent passes as the decedent's property and the killer has no rights by survivorship. . . ."

 Under circumstances where one spouse, here the wife, feloniously and intentionally kills the other spouse who placed his separate property, both real and personal, in joint tenancy with the surviving spouse long before the killing, what is "the share of the decedent" passing as the decedent's property under section 251? Does the decedent's share consist of an undivided one-half of the former joint tenancy property? Or, may the personal representative of the estate apply a tracing or other legal or equitable principle to establish a greater share of the decedent to pass in the estate? These are the issues in this appeal.

Elizabeth Del Pozo (Administrator), special administrator of the estate of Guiseppe Castiglioni (Decedent), appeals an order of the probate court granting the petition of Annie J. Castiglioni (Spouse) requiring the Administrator to release one-half of joint tenancy bank accounts and joint tenancy rents to Spouse. Spouse stands convicted of the first degree murder of

---

[1] All statutory references are to the Probate Code unless otherwise specified.

[2] Unfortunately, courts of our nation too often have had to deal with the disposition of property after a killing of one cotenant by the other. (See, e.g., cases collected in Annot. (1983) 25 A.L.R.4th 787, Annot. (1972) 42 A.L.R.3d 1116, and Later Case Services; see also 8 West's U. Laws Ann. Prob. Code (1983) § 2-803, pp. 174-175.)

Decedent with a true finding the murder was intentional and carried out for financial gain. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1).)[3] She is sentenced to prison for life without possibility of parole on the first degree murder count.[4]

Administrator argues that although section 251 and case law determine the disposition of joint tenancy property where one joint tenant kills the other as in this case, it was error to award one-half to Spouse in light of the fact the accounts were Decedent's separate property before marriage.

Considering developments in California statutory law with respect to tracing and in the context of existing decisional law, we conclude the court erred in awarding one-half of the joint tenancy accounts and rents to the surviving Spouse who feloniously and intentionally killed the Decedent.

With respect to accounts subject to statutes dealing with tracing, we hold the share of the decedent under section 251 must be determined with reference to the tracing statutes. Similarly, section 251 expressly applies to real property and we determine adherence to the legislative purpose of the statutory scheme requires applying an identical result to this form of property. Since the matter was decided in the trial court without consideration of recent laws relating to tracing, we remand the case for further consideration in light of the tracing statutes.[5]

## FACTUAL AND PROCEDURAL HISTORY[6]

Spouse killed Decedent on June 5, 1994. At the time, she was 51 and he was 85 years of age. They were married about five years and had lived together approximately five years before the marriage.

---

[3]We have taken judicial notice of the record in People v. Castiglioni (Super. Ct. San Diego County, No. SCD104197), the criminal case against Spouse. (Evid. Code, § 452.) An appeal is pending in that case under this court's No. D023090. (See § 254, subd. (a), providing "A final judgment of conviction of felonious and intentional killing is conclusive for purposes of this part [§§ 250-258].")

[4]Spouse also stands convicted and sentenced to prison for life without parole on a count of conspiracy to commit Decedent's murder, with the punishment on the latter count stayed. A six-year prison term for her conviction of solicitation to commit Decedent's murder was ordered to run concurrent to the other terms.

[5]During the appeal we have asked for and received from the parties additional briefing on, among other things, the application of the concept of tracing and the possible application of the concept of transmutation.

[6]At the time of the hearing in the probate court, Spouse was charged with, but not yet convicted of, the murder. The probate court decided the matter in accord with both parties' request of the court to assume the surviving joint tenant Spouse had been convicted of feloniously and intentionally killing Decedent and that section 251 applies to this case. As stated above in footnote 3, Spouse has now been convicted of such a killing but in light of the pending appeal the judgment of conviction is not yet final.

Before the couple married, Decedent owned three parcels of real property as his separate property: one commercial in National City, and one residential rental and one personal residential in Chula Vista. Decedent similarly owned savings accounts before the couple married.

In February 1989, about one month after the marriage, joint tenancy deeds prepared by Decedent's attorneys were recorded placing title of the parcels of real property in the name of "Guiseppe Castiglioni and Annie J. Castiglioni, husband and wife as joint tenants." After the marriage Decedent also placed at least two savings accounts in his and Spouse's names as joint tenants.

At the time of Decedent's death the three parcels of real property were estimated to be worth $380,000, with the rental properties generating about $10,000 annual income. The two accounts in joint tenancy had balances totaling approximately $64,000 at the date of death.

Decedent died intestate, leaving as his sole heir (other than Spouse) an adult married daughter.[7] The record suggests Spouse has no issue.

As the matter came before the probate court the facts (other than the stipulation the court was to assume a felonious and intentional killing) were established by declarations alone, with the Spouse's declaration giving rise to the conclusion that Decedent's separate property was the source of the joint tenancies in the real property and accounts.[8] In ruling the Administrator was required to release to Spouse sums equal to one-half of all joint tenancy bank accounts (forthwith) and one-half of all rents received from joint tenancy real property (at specified intervals), the trial court stated:

"The reason I think that Probate Code 251 is unambiguous in its application here is first that it is a fallacy to say that the widow is benefiting by the death of Guiseppe Castiglioni. What the death accomplished was a severance, which she herself might have accomplished by a voluntary deed any time after the joint tenancy was created in 1989. Either of the joint tenants would have had the power to sever the joint tenancy and to enjoy an unrestricted right to their half interest. So the fact is that the widow here

---

[7]Originally, Decedent's daughter petitioned for letters of administration and special administration. However, at Spouse's request and by stipulation, an independent, professional fiduciary was appointed special administrator with power to possess and separately account for joint tenancy property.

[8]Spouse's declaration states in part: "About a month after our marriage, my husband place [*sic*] his real property in joint tenancy with me. He said he wanted me to be secure. He also place [*sic*] some savings accounts in joint tenancy but maintained one account in his name alone."

didn't acquire a half interest at the death of the decedent, she acquired that half interest in 1989 when the deed of gift was given to her.

"I think it's farfetched to think that at that time she would have contemplated the tragedy that resulted four years later. And I think the Legislature had exactly this kind of scenario in mind when it adopted Probate Code 251 to make it clear that the severance itself at the death of—excuse me—it made it clear that, by creating a severance by operation of law upon the death of the one joint tenant who died by homicide, it was varying the historical principle that the survivor would have owned 100 percent instead of only 50 percent.

". . . [T]he picture might be different if some affirmative defense were before the court suggesting some equitable theory other than merely the concept of profiting by one's own wrong raised to defeat the widow's ownership, something like—something that would justify a rescission in effect on the original joint tenancy deed. But there is no contention of that kind made. So for those reasons then there are no factual disputes really before the court . . . ."

In opposing Spouse's petition for the order requiring release of one-half of the joint tenancy bank accounts and joint tenancy rents, Administrator relied on both section 251 and cases which predate enactment of the section. Administrator also pointed out that had the marriage been terminated by a dissolution proceeding, rather than by a murder, Spouse would not have received any of the property since Decedent would have been reimbursed for his contributions under Family Code section 2640, subdivision (b),[9] by the process of tracing. Administrator argued that to permit Spouse to acquire one-half of the joint tenancy property when she contributed nothing to it allows her to gain something by her wrongful act of murder that she could not have gained by a dissolution of the marriage. Thus, Administrator asked that equitable principles such as Civil Code sections 2224 and 3517, imposing a constructive trust on wrongfully gained property and proscribing taking advantage of one's own wrong, respectively, be applied to prevent Spouse from receiving one-half of the joint tenancy bank accounts and rents.

---

[9]Family Code section 2640, subdivision (b), reads in part: "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. . . ."

## DISCUSSION

### I

### *Legal Framework*

■ Initially, we point out that succession to property is purely a matter of statute; if words of a statute are clear, the court should not add to or alter them to accomplish a purpose not apparent on the face of the statute or from its legislative purpose, and the court should not construe a statute so as to work a forfeiture in the absence of a clear indication of legislative intent. (*Estate of Kramme* (1978) 20 Cal.3d 567, 572 [143 Cal.Rptr. 542, 573 P.2d 1369].) Since at least 1905, the law of this state has been that there are no inheritance rights for a person who intentionally caused the death of the decedent. (*Id.* at pp. 572-575.) In construing and applying former section 258,[10] *Kramme* (at pp. 576-577) refuses to apply the equitable principles embodied in Civil Code sections 2224 and 3517 which read:

"One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." (Civ. Code, § 2224.)

"No one can take advantage of his own wrong." (Civ. Code, § 3517.)

*Kramme* explains its exclusive use of former section 258 and refusal to apply the Civil Code sections as "consistent with the principle that if a specific statute is enacted covering a particular subject, the specific statute controls and takes priority over a general statute encompassing the same subject. [Citation.]" (*Estate of Kramme, supra,* 20 Cal.3d at p. 576.)

Specific statutes California has enacted with respect to a felonious killer taking property (§§ 250-258) are summarized in pertinent part as follows:

"Any person who feloniously and intentionally caused the decedent's death is not entitled to any property, interest, or benefit under the will, a trust

---

[10]Former section 258 provided: "No person who has unlawfully and intentionally caused the death of a decedent, and no person who has caused the death of a decedent in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, Penal Code, shall be entitled to succeed to any portion of the estate or to take under any will of the decedent; but the portion thereof to which he would otherwise be entitled to succeed goes to the other persons entitled thereto under the provisions of this chapter or under the will of the decedent. A conviction or acquittal on a charge of murder or voluntary manslaughter shall be a conclusive determination of the unlawfulness or lawfulness of a causing of death, for the purposes of this section." (Repealed by Stats. 1983, ch. 842, § 19, p. 3024, eff. Jan. 1, 1985.)

created by or for the benefit of the decedent or in which the decedent has an interest, or by intestate succession, including a general or special power of appointment granted to the killer by the will or trust or any nomination of the killer as executor, trustee, guardian, conservator, or custodian by the will or trust. Prob C § 250. Similarly, *a joint tenant who feloniously and intentionally kills the other joint tenant is not entitled to the decedent's interest by right of survivorship* and a named beneficiary of a life insurance policy or other contractual arrangement who feloniously and intentionally kills the principal or the person on whose life the policy is issued will receive no benefit under the policy. Prob C §[§] [251,] 252. Finally, a person who feloniously and intentionally kills the decedent may not bring or benefit from an action for the decedent's wrongful death. Prob C § 258. . . .

". . . [11] *In a joint tenancy arrangement, whether in real or personal property, joint and multiple party accounts in financial institutions, or any other form of co-ownership with survivorship incident, the decedent's share passes as the decedent's property and the killer has no rights of survivorship.* Prob C § 251. Similarly, Prob C § 252 provides that any insurance policy benefit becomes payable as though the killer had predeceased the decedent. . . .

"Although a final judgment of conviction of felonious and intentional killing is conclusive for purposes of Prob C §§ 250-257, the absence of a conviction does not preclude the court from determining that the killing was felonious and intentional. Prob C § 254(b)." (3 Cal. Decedent Estate Practice (Cont. Ed. Bar 1995) Entitlement to Estate Distribution, § 24.4, pp. 24-6 to 24-7, italics added.)

It thus is readily apparent the Legislature has expressed a sweeping policy against a felonious and intentional killer receiving any form of benefit as a

---

[11]Since section 251 does not so state, we here delete a sentence reading, "In each of these situations, the decedent's property interest or estate passes as if the killer had predeceased the decedent." (See also Miller & Starr, Cal. Real Estate 2d (1989) Holding Title, § 12:45, p. 203, and fn. 15, citing §§ 250 to 256 for the proposition "All assets of the decedent pass as if the killer predeceased the decedent.")

Only sections 250 and 252, relating to the effect of a felonious and intentional killing on the killer's entitlement to interests other than joint tenancies, use the language "as if [or as though] the killer had predeceased the decedent." Were this the rule in the case of joint tenancies, there would be a ready solution to the question of entitlement to the property. All of the property that was held in joint tenancy would pass in the decedent's estate. (See, e.g., *In re Estate of Fiore* (1984) 16 Ohio App.3d 473 [476 N.E.2d 1093, 1095-1096] [holding under statute providing that convicted murderer shall not benefit by the victim's death "in any way" and that victim's property shall pass, be paid or be distributed " 'as if the guilty person had predeceased the decedent,' " the joint tenant murderer has no right to any proceeds in the joint tenancy account held by victim and murderer].)

result of the killing. This policy accords with the view that provisions such as section 251 have "a much wider foundation rooted in public policy that prohibits the killer from obtaining title to property as the fruit of his crime . . . [and that] 'the social interest served by refusing to permit the criminal to profit by his crime is greater than that served by the preservation and enforcement of legal rights of ownership.' " (*Estate of McGowan* (1973) 35 Cal.App.3d 611, 615-616 [111 Cal.Rptr. 39] [interpreting former section 258[12] presumption in context of plea bargain to crime lesser than voluntary manslaughter, and involving insurance, retirement benefits and a car (quoting Cardozo, The Nature of the Judicial Process (1921) p. 43)].)

Section 251 represents the statute specifically applicable to a felonious and intentional killing by a joint tenant. Under *Estate of Kramme, supra,* 20 Cal.3d at page 576, we must apply this specific statute rather than Civil Code sections 2224 and 3517.

## II

### Background on Killings by a Joint Tenant

With respect to the subject of an intentional killing of one joint tenant by the other, California's first specific statute on the subject was enacted in 1983 as former section 201. (Stats. 1983, ch. 842, § 22, p. 3034, eff. Jan. 1, 1985; see 20 Cal. Law Revision Com. Rep. (Dec. 1989) pp. 1001, 1179.) The section was derived from Uniform Probate Code (1983) section 2-803, subdivision (b)[13] and its number was changed to its current number, 251, in 1984. (Stats. 1984, ch. 527, § 3, p. 2086; 20 Cal. Law Revision Com. Rep., *supra,* at pp. 1178-1179.) To date, no reported California case has applied section 251.[14]

Due to the nature of joint tenancy, particularly its incident of survivorship which causes the property to pass not by testamentary disposition but by

---

[12]See footnote 10, *ante,* for text of former section 258. (See now §§ 250, 254.)

[13]Before its amendment in 1993, Uniform Probate Code section 2-803, subdivision (b) read: "Any joint tenant who feloniously and intentionally kills another joint tenant thereby effects a severance of the interest of the decedent so that the share of the decedent passes as his property and the killer has no rights by survivorship. This provision applies to joint tenancies [and tenancies by the entirety] in real and personal property, joint and multiple-party accounts in banks, savings and loan associations, credit unions and other institutions, and any other form of co-ownership with survivorship incidents."

[14]Annotations to the Uniform Probate Code (1983) section 2-803, subdivision (b) (as it read before its 1993 amendment), include two cases from other states applying this derivative of section 251, *In re Estate of Matye* (1982) 198 Mont. 317 [645 P.2d 955] and *Matter of Estate of Snortland* (N.D. 1981) 311 N.W.2d 36. Both cases resolve the issue by effecting a 50-50 split of the joint tenancy property between the felonious killer and the victim's estate. Neither case involved tracing statutes.

virtue of the instrument that created the joint tenancy (see Sterling, *Joint Tenancy and Community Property in California* (1983) 14 Pacific L.J. 927, 951-953, and cases cited), former section 258 (applied in *Estate of Kramme, supra*, 20 Cal.3d at pp. 572-576) did not govern a case involving a felonious killing of one joint tenant by the other. (See *Whitfield* v. *Flaherty* (1964) 228 Cal.App.2d 753, 758, 759-762 [39 Cal.Rptr. 857]; *Abbey* v. *Lord* (1959) 168 Cal.App.2d 499, 506 [336 P.2d 226].) Thus, before the enactment of section 251 (formerly § 201) the court decisions which determined the rights and obligations of a surviving joint tenant who killed the cotenant were in conflict both in reasoning and result. (*Whitfield* v. *Flaherty, supra*, 228 Cal.App.2d at p. 760.[15])

This court first expressed its view favoring a constructive trust theory in the 1959 case of *Abbey* v. *Lord, supra*, 168 Cal.App.2d at page 508, in which we affirmed a judgment quieting title in the administrator of the feloniously killed joint tenant's estate to a 63 percent share of the joint tenancy property.[16] The theory was that the wrongful act of the killer destroyed the survivorship provision of the joint tenancy and effected a tenancy in common. (*Ibid.*) We pointed out, "As readily the [trial] court could have found the joint tenancy was preserved and that the defendant [killer] was a constructive trustee, and that half or all of the property passed thereby to plaintiff [administrator]." (*Id.* at pp. 508-509.) Nevertheless, we upheld the

---

[15]*Whitfield* v. *Flaherty, supra*, 228 Cal.App.2d at page 760, footnote 3, contains a survey of the varying theories and results in the United States authorities then extant as follows: "It has been held that: (1) The killing does not affect the right of the surviving tenant to take the entire interest in the joint tenancy property. [Citation.] (2) The killing destroys the survivorship characteristics of the tenancy and the estate in the property reverts to a tenancy in common. In some instances a constructive trust is imposed on a one-half interest in the property to effect this result. [Citation.] (3) The killing does not result in a termination of the joint tenancy; the survivor and the heirs of the victim remain joint tenants. [Citation.] (4) The killing deprived the wrongdoer of all interest in the property. [Citation.] (5) The killing does not interfere with the vesting of title in the survivor but: (a) The killer is chargeable as a constructive trustee of the whole of the property absolutely, or, in some instances, subject to a life estate in himself as [to] a one-half interest therein, or the equivalent of such a life estate. [Citation.] (b) The killing raises a conclusive presumption that in the natural course of events the deceased joint tenant would have survived the killer and a constructive trust is imposed to effect this result. [Citation.] (c) The killing raises a doubt as to who would survive, which should be resolved against the killer and the whole property subjected to a constructive trust. [Citation.] (d) A constructive trust is imposed on the property to the extent the interest of the killer is enlarged by his wrongful act. [Citation.]"

[16]The 63-37 percent figures in *Abbey* v. *Lord* derived from a December 1953 property settlement agreement entered during a temporary separation after which the couple resumed living together as husband and wife until February 1956, when the husband killed the wife. The defendant husband was convicted by his plea of guilty to manslaughter which the court found to be voluntary. Defendant husband had claimed that in consideration of his returning to live with wife, they agreed to pool their assets and that each would have a one-half interest. (*Abbey* v. *Lord, supra*, 168 Cal.App.2d at pp. 500, 501.)

63-37 percent split based on the conflicting evidence presented, stating: "The [trial] court, however, adopted a practical solution fairest to the plaintiff and to the defendant. This court does not believe that it should countenance the addition of homicide as the approved method of terminating a joint tenancy without affecting the results found by the trial court." (*Id.* at p. 509.)

*Whitfield* v. *Flaherty* points out that *Abbey* v. *Lord* adopted no rule by which to determine whether the whole or what part of the property should be held by the survivor as a constructive trustee. (*Whitfield* v. *Flaherty, supra*, 228 Cal.App.2d at p. 761.) *Whitfield*, involving a murder-suicide, also did not announce a definitive rule since under the facts of the case and any of the various theories, the result would not have been different. (*Id.* at pp. 761-762.)

In *Saltares* v. *Kristovich* (1970) 6 Cal.App.3d 504, 516, 517 [85 Cal.Rptr. 866], a murder-suicide case, the Court of Appeal found the weight of authority is that where one joint tenant intentionally and unlawfully causes the death of his joint tenant, the surviving joint tenant immediately becomes a constructive trustee of the entire property for the benefit of the predeceasing joint tenant's heirs or estate, subject to his right to a life interest in one-half of the property.

In *Johansen* v. *Pelton* (1970) 8 Cal.App.3d 625, 634, 635 [87 Cal.Rptr. 784], a case involving murder-suicide in which the slayer left heirs, the court applied a rule recognizing the killer's preslaying inchoate right to one-half of the property by virtue of the original joint tenancy title. *Johansen* expressed concern for the heirs of the killer and drew an analogy to simultaneous death situations, stating in part:

"The truth of the matter is that from the minute the husband made up his mind to commit the double killing, it was his heirs, not himself, who would be charged as trustees for the estate of the murdered wife. To deprive the heirs of the slayer of all interest in the property is to embrace a policy which tends to work a forfeiture, attainder, or corruption of the blood, [17] with respect to the property interest which the surviving malefactor had at the

---

[17]"Historically, a bill of attainder was a legislative act which, without a judicial trial, decreed punishment of death with consequences of forfeiture of property and 'corruption' or 'attaint' of the bloodline of the supposed wrongdoer; if the act imposed a lesser punishment than death, there was no 'attaint' and the bill was one of 'pains and penalties.' . . . It has been consistently held that '[w]ithin the meaning of the Constitution, bills of attainder include bills of pains and penalties.' . . . In modern application the definition is that '[a] bill of attainder is " 'a legislative act which inflicts punishment without a judicial trial.' " ' " (*California State Employees' Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219, 224 [108 Cal.Rptr. 251], citations omitted; see U.S. Const., art. I, § 9, cl. 3, § 10, cl. 1; Cal. Const. art. I, § 9.)

instant before the slaying, and which, except for intervention on the theory adopted by the trial court, would have passed to his heirs. [Citations.]

"The situation of the murder-suicide is most closely analogous to the situation of a simultaneous death. Under such circumstances the Legislature has adopted a policy which distributes joint tenancy property between the estates of the two joint tenants. [Citations.]" (*Johansen* v. *Pelton, supra,* 8 Cal.App.3d at pp. 631-632.)

The latest reported California case on the subject of the disposition of joint tenancy property when one joint tenant murders the other is this court's *Estate of Hart* (1982) 135 Cal.App.3d 684 [185 Cal.Rptr. 544], involving another murder-suicide. Following *Johansen* v. *Pelton, supra,* 8 Cal.App.3d 625, we applied the rule dividing the jointly held real property equally between the estates of the victim and the slayer, stating in part:

"[U]nder California law the inchoate interest of a spouse in joint tenancy property (absent an intent to the contrary) is his or her separate property. [Citation.] ' "The theory underlying those decisions which justify the result of the heirs of the murdered joint tenant taking all (not merely one-half) of the property is that, by reason of the murder, the murdered joint tenant is thereby prevented from ever securing title to the whole by survivorship. However, it is entirely a matter of speculation as to which joint tenant would have outlived the other, in the event the murder had not been committed, or that a severance would not have taken place during the lifetime of both joint tenants as a result of alienation by either, partition, or divorce. Therefore it seems that the result reached [by these cases allowing all of the property to go to the victim's estate come] very close to working a corruption of blood, or a forfeiture of estate, as to one who has been guilty of crime . . . ." [Citation.]' (*Johansen* v. *Pelton, supra,* at p. 633.) Such a rule effects a

In a case applying the same Uniform Probate Code section as is involved here on a killing of one joint tenant by the other, the North Dakota Supreme Court held one-half of the jointly held property passes to the decedent's estate and the other half is retained by the killer, stating in part:

"A contrary result, awarding all of the joint tenancy property to the decedent's estate, would work a forfeiture on the killer. At early common law, an offender convicted of a capital offense was placed in a state of attainder. Attainder had three principle incidents: forfeiture of property to the king; corruption of blood, which prevented the offender's heirs from inheriting from or through him; and 'civil death' (extinction of civil rights). The common law incidents of attainder have generally been abandoned under modern policies of law, and are forbidden by the Constitutions of many States. [Citation.] Courts in other jurisdictions have held that a result which would give all of the joint tenancy property to the decedent's estate would work a forfeiture on the wrongdoer. See, e.g., *Johansen* v. *Pelton* 8 Cal.App.3d 625 [87 Cal.Rptr. 784]. . . ." (*Matter of Estate of Snortland, supra,* 311 N.W.2d at p. 38, fn. 1.)

It is not uniformly held that depriving the surviving joint tenant killer of any interest represents a forfeiture. (See *In re Estate of Fiore, supra,* 476 N.E.2d at p. 1097.)

forfeiture, an extinction of civil rights in an estate, real or personal, where joint tenancy is the title form when the murder occurs. Such a corruption of the blood by the state law is violative of and banned by the United States Constitution. (Art. I, § 10; art. III, § 3.)

"The rule that the survivor take all or none disregards the general principle disfavoring unjust enrichment and fails to consider what the malefactor gained or did not gain as a result of the killing. The rule recommended in the comment (a) to the Restatement [treating the murderer as having predeceased the survivor] appears to unduly weigh what the victim lost; it does so in derogation of what the slayer had, equitably if not legally, before the wrongful act. 'The seeming anomaly that the part gained and the part lost cannot be reconciled is due to the fact that the inchoate rights—with survivorship—of the two joint tenants are in reality greater than the whole while the tenancy exists. Any solution must, therefore, at best be a compromise. For the reasons set forth above it is concluded that a solution which recognizes the slayer's preslaying inchoate right to one-half the property is most equitable.' (*Id.* at p. 635.)

"The trial court here adopted this latter view. It cannot be said that such a result is contrary to law or is an unreasonable or unfair solution to a most difficult problem." (*Estate of Hart, supra,* 135 Cal.App.3d at pp. 690-691, italics deleted.)

Thus, in the murder-suicide situation, we have squarely held the joint tenancy property is to be divided equally between the estates of the victim and the murderer. Citing *Hart* and *Johansen,* a 1983 article on the subject states: "The current state of California law is that the joint tenancy property is divided equally between the killer and the estate of the victim based on a constructive trust or inchoate right theory. Treatment of community property in this situation is the same." (Sterling, *Joint Tenancy and Community Property in California, supra,* 14 Pacific L.J. at p. 956, fns. omitted.)[18]

It is to be observed that where there is no murder-suicide, i.e., where the murderer lives indefinitely after the killing and receives none of the property

---

[18]With respect to community property and deaths not involving a felonious and intentional killing by a spouse, section 100 provides: "Upon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent." (See also § 28, defining community property.)

As to the intestate share of a surviving spouse in community property, quasi-community property and separate property, section 6401 provides:

"(a) As to community property, the intestate share of the surviving spouse is the one-half of the community property that belongs to the decedent under Section 100.

"(b) As to quasi-community property, the intestate share of the surviving spouse is the one-half of the quasi-community property that belongs to the decedent under Section 101.

"(c) As to separate property, the intestate share of the surviving spouse is as follows:

that was held in joint tenancy, the concerns expressed in *Hart* and *Johansen* about effecting a forfeiture, attainder or corruption of blood upon the murderer's heirs are inapplicable. Generally, one who may become an heir cannot be viewed as having a protectable interest in property of a person from whom the potential heir may one day inherit. The surviving joint tenant killer, for example, may spend or otherwise transfer the property before death. Thus, depriving the surviving joint tenant killer of any interest in the property cannot be said to impact a protectable interest of the heirs from the standpoint of any prohibited corruption of blood.

Similarly, in the case of the indefinitely surviving murderer, there is no analogy to be drawn from the simultaneous death statute as was done in *Johansen* in order to suggest a legislative purpose there be an equal division between the murderer and the estate of the murdered joint tenant.

The primary consistencies to be discerned between the murder-suicide joint tenancy situation and the indefinitely surviving joint tenant murderer situation are the inchoate rights, with survivorship, that are incident to the creation of a joint tenancy. (Civ. Code, § 683; *Tenhet* v. *Boswell* (1976) 18 Cal.3d 150, 155 [133 Cal.Rptr. 10, 554 P.2d 330] ["[Civil Code section 683] does not abrogate the common law rule that four unities are essential to an estate in joint tenancy: unity of interest, unity of time, unity of title, and unity of possession"]; see also *Estate of Blair* (1988) 199 Cal.App.3d 161, 166 [244 Cal.Rptr. 627] ["the 'grand' and 'distinguishing' incident of the joint tenancy estate is the right of survivorship"].)

Before the 1983 enactment of the predecessor to section 251, California's rule with respect to forfeiture in the joint tenancy murder-suicide situation appears to have been that where there is no evidence of the parties' respective contributions to the joint tenancy and the four unities of this form of title are presumptively present, it is a prohibited forfeiture to deprive the surviving killer's estate of the (usually) one-half inchoate interest held before the killing. However, there is no such forfeiture in depriving the surviving killer's estate of the right of survivorship that also existed from the time the

---

"(1) The entire intestate estate if the decedent did not leave any surviving issue, parent, brother, sister, or issue of a deceased brother or sister.

"(2) One-half of the intestate estate in the following cases:

"(A) Where the decedent leaves only one child or the issue of one deceased child.

"(B) Where the decedent leaves no issue but leaves a parent or parents or their issue or the issue of either of them.

"(3) One-third of the intestate estate in the following cases:

"(A) Where the decedent leaves more than one child.

"(B) Where the decedent leaves one child and the issue of one or more deceased children.

"(C) Where the decedent leaves issue of two or more deceased children."

joint tenancy was created. Where the killer survived indefinitely and there was proof of the parties' respective contributions to the joint tenancy, forfeiture apparently is not a concern and the property that was held in joint tenancy is divided between the killer and the decedent's estate according to the proof as to contributions.

III

*Other Indications of Legislative Purpose*

Application of the common law rule as to the nature of joint tenancy leads directly to the conclusion the estate of the victim and the slayer share equally in the joint tenancy property after the murder. This approach is understandable and easy to apply. However, there is no definitive indication in the legislative history of section 251 that the equal share result was what was intended by the phrase "the share of the decedent passes as the decedent's property" after the joint tenancy is severed and the right to survivorship is removed by the felonious and intentional killing. The Law Revision Commission comment to the most recent enactment of section 251 states in pertinent part: "This section is the same in substance as Section 2-803(b) of the Uniform Probate Code (1987) and is consistent with prior California law. See, e.g. Estate of Hart, 135 Cal.App.3d 684 [185 Cal.Rptr. 544] . . . (1982); Johansen v. Pelton, 8 Cal.App.3d 625 [87 Cal.Rptr. 784] . . . (1970). . . ." (20 Cal. Law Revision Com. Rep., *supra*, at p. 1178.)

As we have seen, the *Hart* and *Johansen* cases, cited as consistent with section 251, pertain only to murder-suicide and are founded in significant part on a concern for the heirs of the murderer. The inchoate equal interest rationale cannot be applied to the 63-37 percent result reached in *Abbey* v. *Lord*, *supra*, 168 Cal.App.2d at page 508, which, after severing the parties' interests, related the tenancy in common back to the original contributions to the joint tenancy. *Abbey* v. *Lord*, not a murder-suicide case, is factually parallel to the case at bar in its aspects of known contributions by those who entered the joint tenancy and the existence of an indefinitely surviving joint tenant killer.

We presume the Legislature was cognizant of the *Abbey* v. *Lord* construction of Civil Code sections 2224 and 3517 in approving an unequal "share of the decedent" based on the decedent's contribution when it enacted section 251 and its predecessor sections starting in 1983. (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874] [" 'It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have

enacted and amended statutes in the light of such decisions as have a direct bearing on them. [Citations.]' [Citations.]"]; *Hill* v. *Newkirk* (1994) 26 Cal.App.4th 1047, 1055, fn. 7 [31 Cal.Rptr.2d 859].)

There is nothing in the statutory language or history to indicate the Legislature intended to alter the *Abbey* v. *Lord* result as applied to cases in which there is a felonious and intentional killing by a joint tenant who survives indefinitely.

## IV

### *Accounts*

Support for the conclusion that we must take into consideration the separate property contributions of the decedent to the joint account is to be found in other statutory changes made since 1983 which permit tracing the source of the property. In the case of accounts, section 5305 provides:

"(a) Notwithstanding Sections 5301 to 5303,[19] inclusive, if parties to an account are married to each other, whether or not they are so described in the deposit agreement, *their net contribution* to the account *is presumed to be* and remain their *community property.*

---

[19]Sections 5301 to 5303 provide, in pertinent part:

"Section 5301. "(a) An account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."

"Section 5302. "(a) Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent. If there are two or more surviving parties, their respective ownerships during lifetime are in proportion to their previous ownership interests under Section 5301 augmented by an equal share for each survivor of any interest the decedent may have owned in the account immediately before the decedent's death; and the right of survivorship continues between the surviving parties."

"Section 5303. "(a) The provisions of Section 5302 as to rights of survivorship are determined by the form of the account at the death of a party.

"(b) Once established, the terms of a multiple-party account can be changed only by any of the following methods:

"(1) Closing the account and reopening it under different terms.

"(2) Presenting to the financial institution a modification agreement that is signed by all parties with a present right of withdrawal. If the financial institution has a form for this purpose, it may require use of the form.

"(3) If the provisions of the terms of the account or deposit agreement provide a method of modification of the terms of the account, complying with those provisions.

"(4) As provided in subdivision (c) of Section 5405.

"(c) During the lifetime of a party, the terms of the account may be changed as provided in subdivision (b) to eliminate or to add rights of survivorship. Withdrawal of funds from the account by a party with a present right of withdrawal during the lifetime of a party also eliminates rights of survivorship upon the death of that party with respect to the funds withdrawn."

"(b) Notwithstanding Sections 2581 and 2640 of the Family Code, *the presumption* established by this section is a presumption affecting the burden of proof and *may be rebutted by proof* of either of the following:

"(1) *The sums on deposit that are claimed to be separate property can be traced from separate property* unless it is proved that the married persons made a written agreement that expressed their clear intent that the sums be their community property.

"(2) The married persons made a written agreement, separate from the deposit agreement, that expressly provided that the sums on deposit, claimed not to be community property, were not to be community property.

"(c) Except as provided in Section 5307, a right of survivorship arising from the express terms of the account or under Section 5302, a beneficiary designation in a Totten trust account, or a P.O.D. payee designation, may not be changed by will.

"(d) Except as provided in subdivisions (b) and (c), a multiple-party account created with community property funds does not in any way alter community property rights."[20] (Italics added.)

That these provisions as to accounts are controlling is made clear by subdivision (b) of Civil Code section 683, the basic statute on creation of

---

[20]The following definitions encompass the accounts involved in this case:

"Section 5122. "(a) 'Account' means a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, savings account, certificate of deposit, share account, and other like arrangement.

"(b) 'Account' does not include:

"(1) An account established for deposit of funds of a partnership, joint venture, or other association for business purposes.

"(2) An account controlled by one or more persons as the duly authorized agent or trustee for a corporation, unincorporated association, or charitable or civic organization.

"(3) A regular fiduciary or trust account where the relationship is established other than by deposit agreement.

"(4) An account established for the deposit of funds of the estate of a ward, conservatee, or decedent."

"Section 5128. " 'Financial institution' includes:

"(a) A financial institution as defined in Section 40.

"(b) An industrial loan company as defined in Section 18003 of the Financial Code."

"Section 5130. " 'Joint account' means an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship."

"Section 5132. "A 'multiple-party account' is any of the following types of account:

"(a) A joint account."

"Section 40. " 'Financial institution' means a state or national bank, state or federal savings and loan association or credit union, or like organization."

Also, Financial Code section 852 provides: "A bank account that is a multiple-party account as defined in Section 5132 of the Probate Code is governed by Part 2 (commencing with Section 5100) of Division 5 of the Probate Code."

joint tenancies. (See *Estate of MacDonald* (1990) 51 Cal.3d 262, 271 [272 Cal.Rptr. 153, 794 P.2d 911].) Civil Code section 683 provides in part:

"(a) A joint interest is one owned by two or more persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy, or by transfer from a sole owner to himself or herself and others . . . when expressly declared in the transfer to be a joint tenancy . . . . A joint tenancy in personal property may be created by a written transfer, instrument, or agreement.

"(b) *Provisions of this section do not apply to a joint account in a financial institution if Part 2 (commencing with Section 5100) of Division 5 of the Probate Code applies to such account.*" (Italics added.)

Section 5305 is contained in part 2 (commencing with § 5100) of division 5 of the Probate Code. Thus, section 5305 and related provisions in part 2, not Civil Code section 683, apply to this case.

Concerning the 1983 enactment of section 5305, the California Law Revision Commission points out, "With respect to the spouses and those claiming under them, Section 5305 reversed the presumption under former law that community funds deposited into a joint [tenancy] account with right of survivorship are presumed to be converted into true joint tenancy funds and to lose their character as community property. [Citations.] The former presumption was inconsistent with the general belief of married persons. Married persons generally believe that community funds deposited in a joint tenancy account remain community property. [Citation.] The presumption created by Section 5305 is consistent with this general belief." (20 Cal. Law Revision Com. Rep., *supra*, at p. 1412; see 53 West's Ann. Prob. Code (1991 ed.) § 5305, p. 201.)

With respect to rebutting the presumption of section 5305, subdivision (a), the Law Revision Commission states: "Paragraph (1) of subdivision (b) specifies one of the two methods of rebutting the presumption—the source-of-funds or tracing rule. *If the person having the burden of proof can trace separate funds into a joint account, the presumption of community property is overcome and the funds retain their separate character.* If separate funds have been commingled with community funds but remain ascertainable or traceable into a proportionate share of the account, the funds retain their separate character. On the other hand, if separate and community funds are so commingled that the party having the burden of proving that the funds are separate cannot meet that burden, then the entire account is treated as community property. See generally 7 B. Witkin, Summary of California Law

*Community Property* §§ 33-34, at 5126-28 (8th ed. 1974). Even though the separate funds can still be traced, nothing prevents the married persons from making an agreement that expresses their clear intent that the funds be community property. If the person claiming that such an agreement was made proves that fact by a preponderance of the evidence, the agreement is given effect as provided in the last clause of paragraph (1)." (20 Cal. Law Revision Com. Rep., *supra*, at p. 1410; see 53 West's Ann. Prob. Code, *supra*, § 5305, p. 199.)

Section 5305 is clear in its application and purpose. When determining what is "the share of the decedent" in an account subject to section 251, section 5305 must be considered. Doing so here, it is apparent a 100 percent contribution of Decedent to the joint tenancy accounts can readily be traced as provided for in subdivision (b) of section 5305. Since the trial court and the parties did not consider section 5305, including its presumption, its burden of proof rule[21] and its variable methods of rebutting the presumption, we deem it appropriate that the matter be remanded for further determination in light of these specific provisions. (See *Estate of Blair, supra,* 199 Cal.App.3d at pp. 167-169.)

V

*Real Property*[22]

Section 251 expressly applies to real property. Its second sentence reads: "This section applies to joint tenancies in real and personal property, joint and multiple-party accounts in financial institutions, and any other form of coownership with survivorship incidents."

Concerning real property held by married persons in joint tenancy upon a death of one spouse not subject to section 251, we have said: "For purposes of determining the character of real property on the death of one spouse, there is a presumption 'that the property is as described in the deed and the

---

[21]"The presumption created by Section 5305 is one affecting the burden of proof. See also Evid. Code § 606 ('The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact'). This requires proof that the funds of married persons in a joint account are not community property. Subdivision (b) of Section 5305 specifies the proof that must be made to rebut the presumption that the property is community property." (20 Cal. Law Revision Com. Rep., *supra*, at p. 1410; 53 West's Ann. Prob. Code, *supra*, § 5305, p. 199.)

[22]This appeal deals with rentals from real property, not the real property itself. We apply the rule that the proceeds of joint tenancy property, in the absence of contrary agreement, retain the character of the property from which they are acquired. (*Fish* v. *Security-First Nat. Bank* (1948) 31 Cal.2d 378, 387 [189 P.2d 10], overruled on another point in *Estate of Propst* (1990) 50 Cal.3d 448, 462 [268 Cal.Rptr. 114, 788 P.2d 628].)

burden is on the party who seeks to rebut the presumption.' (*Schindler* v. *Schindler* (1954) 126 Cal.App.2d 597, 602 [272 P.2d 566].) Thus '[t]he fact that a deed was taken in joint tenancy establishes a prima facie case that the property is in fact held in joint tenancy.' (*Id.* at p. 601.) A devisee may test a surviving joint tenant's claim by showing the property held under a joint tenancy deed is in fact community property. (*Sandrini* v. *Ambrosetti* (1952) 111 Cal.App.2d 439, 447-451 [244 P.2d 742].) Extrinsic evidence is admissible to show the joint tenants actually intended the property to be held as community property. (*Tomaier* v. *Tomaier* (1944) 23 Cal.2d 754, 757 [146 P.2d 905].)" (*Estate of Blair, supra,* 199 Cal.App.3d at p. 167; see also *Estate of Petersen* (1994) 28 Cal.App.4th 1742 [34 Cal.Rptr.2d 449] [giving effect to the rebuttable presumption that the property is as described in the deed— there, joint tenancy].)

*Tomaier* v. *Tomaier, supra,* 23 Cal.2d at page 758, points out that if the evidence establishes that the property is held as community property, it cannot also be held in joint tenancy, for certain incidents of joint tenancy are inconsistent with incidents of community property.

Separate property of a married person includes "[a]ll property owned by the person before marriage." (Fam. Code, § 770, subd. (a)(1).) Real or personal property may be transmuted by married persons from separate to community (or from community to separate or from separate of one to separate of the other spouse). (Fam. Code, § 850.) However, "transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely effected," and a "transmutation of real property is not effective as to third parties without notice thereof unless recorded." (Fam. Code, § 852, subds. (a) and (b).) Thus, in the absence of a properly formalized transmutation, the real property under consideration here is to be considered separate property. (See *Estate of MacDonald, supra,* 51 Cal.3d at pp. 268-273 [for background and application of formalities of transmutation]; see also *Estate of Blair, supra,* 199 Cal.App.3d at pp. 167-169.)

In the case of a proceeding for dissolution of marriage the basic rule is that the court is required to divide the community property equally. (Fam. Code, § 2550.) Moreover, for purposes of dividing the property on dissolution of marriage or legal separation, there is a presumption affecting the burden of proof that "property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property" is community property. (Fam. Code, § 2581.) The presumption is rebuttable only by (a) "[a] clear

statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property," or (b) "[p]roof that the parties have made a written agreement that the property is separate property." (*Ibid.*) Nevertheless, reimbursement for contributions to the acquisition of property, as defined to include generally the equity in property and improvements but not payments for interest, maintenance, insurance or taxes, is also provided for in cases of division of property on dissolution of marriage or legal separation. Family Code section 2640, subdivision (b), provides: "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division."

Administrator argues, we think properly, that this tracing provision along with the section 5305 tracing provision manifests a legislative policy that a party will not lose his or her separate property interest by the transfer into joint tenancy form. More forcefully, Administrator observes that had the marriage of Decedent and Spouse been terminated by a dissolution proceeding rather than by murder, and had Family Code section 2640 been applied, Decedent would have been entitled to an award of all of the property by the tracing and reimbursement process.[23] As a result, Administrator asserts, an award of one-half to the murdering spouse amounts to allowing that spouse to gain something by the wrongful act of murder.

While it is clear that the Family Code tracing section is inapplicable to this case, we cannot attribute to the Legislature a purpose of placing in a better financial condition a spouse who terminates the marriage by murder than one who terminates the marriage by the legal process of dissolution of marriage. To the contrary, given the strong indicia of legislative intent in

---

[23]We note that support for this conclusion is to be found in the California Law Revision Commission's Recommendation relating to marital property presumptions and transmutations which led to the enactment of revised presumptions about marital property and the predecessor to Family Code section 853, concerning the formalities of transmutation, among other things. (17 Cal. Law Revision Com. Rep. (Sept. 1983) p. 205; see Stats. 1984, ch. 1733, § 3, p. 6302.)

At page 212 of the Law Revision Commission Recommendation it is stated: "The law should continue to state the basic rule that all property acquired during marriage is *community property unless traced to a separate property source or transmuted* by the spouses. The form of title should not create a separate property presumption or inference but should simply be evidence, like any other, of the intent of the spouses as to the manner of holding the property." (17 Cal. Law Revision Com. Rep., *supra*, p. 212, italics added.)

provisions such as sections 5301, 5302 and 5305, and Family Code sections 2581 and 2640 which allow for rebuttal of joint interest presumptions by means of tracing, we find as a legislative purpose in enacting section 251 a right to trace contributions with respect to real property that is equal to any other tracing right where one spouse feloniously and intentionally kills the other. Any other result would be singularly inequitable and irreconcilable with the statutory rules of tracing adopted since the decisions in cases such as *Estate of Hart, supra,* 135 Cal.App.3d 684 and *Johansen v. Pelton, supra,* 8 Cal.App.3d 625.

 We conclude as to the real property held in joint tenancy that is subject to the severance of the joint interest and right of survivorship under section 251 by virtue of the felonious and intentional killing, the "share of the decedent" that passes as the decedent's property is to be calculated by application of principles of tracing and reimbursement of contributions as in the case of accounts and the case of division of property on dissolution of marriage. This conclusion, we note, is generally consistent with the indefinitely surviving joint tenant murder case of *Abbey v. Lord, supra,* 168 Cal.App.3d 499.

As with the trial court's determination on the accounts, the matter of tracing was not presented for determination with respect to the real property. Thus, it is appropriate to remand the matter for the court's determination of the facts for purposes of applying the tracing rules.[24]

### DISPOSITION

The order is reversed. Administrator is awarded her costs on appeal.

Work, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied December 8, 1995, and respondent's petition for review by the Supreme Court was denied February 15, 1996.

---

[24]Since the possible application to this case of *In re Marriage of Haines* (1995) 33 Cal.App.4th 277 [39 Cal.Rptr.2d 673] has not been fully briefed, we express no opinion on whether this development in the law concerning establishing the separate or community character of property for purposes of dividing it on dissolution of a marriage applies here.